267 F.2d 715
 30 P.U.R.3d 222
 WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
UNITED STATES of America and Federal Communications
Commission, Respondents, American Cable & Radio Corporation,
All America Cables and Radio, Inc., The Commercial Cable
Company, Mackay Radio and Telegraph Company, R.C.A.
Communications, Inc., and American Communications
Associations, Intervenors.
 No. 231, Docket 25321.
 United States Court of Appeals Second Circuit.
 Argued March 4, 1959.
Decided June 15, 1959.
 
 John H. Waters, New York City (William Wendt and Herbert G. Telsey on the brief), all of New York City, for petitioner.
 Richard A. Solomon, Asst. General Counsel for the Federal Communications Commission, Washington, D.C. (Victor R. Hansen, Asst. Atty. Gen., Henry Geller, Attorney, Department of Justice, and John L. Fitzgerald, General Counsel, and Ruth V. Reel, Counsel, Federal Communications Commission, Washington, D.C., on the brief), for respondents.
 
 
 1
 John A. Hartman, Jr., New York City (John F. Gibbons and William A. Kelleher, New York City, on the brief), for intervenors American Cable & Radio Corporation, All America Cables and Radio, Inc., The Commercial Cable Company, and Mackay Radio and Telegraph Company.
 
 
 2
 Howard R. Hawkins, New York City (Leonard W. Tuft and Frederick M. Porter, New York City, on the brief), for intervenor R.C.A. Communications, Inc.
 
 
 3
 Victor Rabinowitz, New York City (Rabinowitz & Boudin, New York City, on the brief), for intervenor American Communications Association.
 
 
 4
 Before MEDINA and HINCKS, Circuit Judges, and MATHES, District Judge.[1]
 
 
 5
 MATHES, District Judge.
 
 
 6
 Invoking the jurisdiction of this Court under 5 U.S.C.A. 1032 (64 Stat. 1129 (1950)), The Western Union Telegraph Company petitions to set aside an order of the Federal Communications Commission made July 9, 1958 pursuant to 222(c)(2) of the Communications Act (47 U.S.C.A. 222(c)(2), 57 Stat. 5 (1943)), modifying 'the Commission's Order of September 27, 1943 * * * to provide that * * * Western Union * * * is directed (1) on or before December 31, 1958 to present to the Commission a plan pursuant to which * * * Western Union * * * proposes to divest itself of its international telegraph operations, (2) such plan to provide for divestment by any method permissible under then existing statutes * * * within a period of not more than 6 months from the date of the approval of the plan by the Commission * * * (and) * * * (3) to report to the Commission in detail, one month from the effective date of this Order and monthly thereafter, its progress with respect to the divestment * * *' (In the Matter of The Western Union Telegraph Company, Docket No. 10151, F.C.C. (1958).)
 
 
 7
 By the Commission's order of September 27, 1943, the merger of Western Union and Postal Telegraph, Inc., pursuant to 222(c)(1) had been approved, and Western Union was directed 'to exercise due diligence in bringing about the divestment of its international telegraph operations * * * as promptly as it reasonably can * * *' (Application for Merger of The Western Union Telegraph Company and Postal Telegraph, Inc., Docket No. 6517, 10 F.C.C. 148, 171 (1943).)
 
 
 8
 The salient facts, as found by the Commission in this proceeding, are these: The Western Union Telegraph Company was organized in New York in 1851. During the last century, its landline facilities were extended throughout the continental limits of the United States. Having acquired by merger in 1943 the facilities of the Postal Telegraph system, Western Union today not only has a virtual landline monopoly throughout the continental United States, but also has physical connections with the landline telegraph companies serving the Dominion of Canada and the Republic of Mexico.
 
 
 9
 Western Union entered into the international telegraph field shortly after the first transatlantic cable was successfully laid in 1866, and now operates ten North Atlantic cables extending from New York and Massachusetts to Europe via Nova Scotia, Newfoundland and the Azores, over which it provides direct telegraph service to points in England, Scotland, Ireland, France, Belgium and Holland; it also operates submarine cables from Florida to Cuba and Barbados and, through the facilities of connecting carriers, provides international telegraph service to various points throughout the world.
 
 
 10
 Of the ten North Atlantic cables over which Western Union transmits international telegraph messages, five are leased by it from an English concern, the Anglo-American Telegraph Company, Limited, under a 99-year lease which expires in the year 2010. The annual rental for these five cables is 262,500 pounds.
 
 
 11
 There are at present three American overseas cable carriers: (1) American Cable & Radio Corporation with its subsidiaries: All American Cables and Radio, Inc., The Commercial Cable Company, and Mackay Radio and Telegraph Company, (2) R.C.A. Communications, Inc., and (3) Western Union.
 
 
 12
 In the hearings which preceded enactment in 1943 of 222 of the Communications Act (47 U.S.C.A. 222), under which the merger of Western Union and Postal became legally permissible despite the Federal antitrust laws, concern was voiced that the merged company, through ownership of the single remaining nation-wide landline telegraph system, would be in a position to control the distribution of outbound international telegraph traffic and to favor its own international cable facilities.
 
 
 13
 Accordingly, 222(c)(2) of the Communications Act was enacted in 1943 (57 Stat. 51) to provide that:'Any proposed consolidation or merger of domestic telegraph carriers shall provide for the divestment of the international telegraph operations theretofore carried on by any party to the consolidation or merger, within a reasonable time to be fixed by the Commission, after the consideration for the property to be diversted is found by the Commission to be commensurate with its value, and as soon as the legal obligations, if any, of the carrier to be so divested will permit. The Commission shall require at the time of the approval of such consolidation or merger that any such party exercise due diligence in bringing about such divestment as promptly as it reasonably can.' 47 U.S.C.A. 222(c)(2).
 
 
 14
 And 222(e) directs that the merged company, Western Union, distribute overseas telegraph traffic among the several international carriers and divide the charges for such traffic 'in accordance with such just, reasonable, and equitable formula in the public interest as * * * the Commission shall approve * * *' (Id. 222(e)(1).)
 
 
 15
 Following enactment of 222, application was filed with the Commission to permit consolidation or merger of The Western Union Telegraph Company and Postal Telegraph, Inc. Public hearings were held and the Commission, finding that the proposed merger was in the public interest, granted the application by the aforementioned order of September 27, 1943, and the merger was thereafter effectuated. (Application for Merger, supra, 10 F.C.C. at 170-171.)
 
 
 16
 The Commission then found that under the circumstances and in view of the difficulties involved, a period of one year from September 27, 1943, was a reasonable time for Western Union to complete divestment of its international cable operations; but declared that the Commission would require the merged company to report from time to time on its negotiations for divestment and would also require that due diligence be exercised to bring about a speedy and satisfactory conclusion of such negotiations; and stated that, in view of the unpredictable nature of the problem and in particular the unsettled effects of the war, if divestment could not reasonably be accomplished within a period of one year, the Commission would consider an appropriate petition for extension of time. (Id., 10 F.C.C. at 152-154.)
 
 
 17
 By the time this proceeding was instituted by Commission order of March 5, 1952, Western Union had petitioned for and procured 8 annual extensions of time within which to present a plan of divestment, and had filed with the Commission 32 quarterly reports on the status of negotiations for divestment under the order of September 27, 1943. (10 F.C.C. at 171.)
 
 
 18
 The decision of the Commission in this proceeding suggests six methods whereby Western Union could effect divestment, namely: (a) private sale, (b) public sale, (c) sale to Western Union stockholders, (d) spin-off, (e) split-off, and (f) split-up.
 
 
 19
 The 'private-sale' method would of course involve negotiation to reach agreement as to a 'consideration for the property to be divested * * * commensurate with its value' (47 U.S.C.A. 222(c)(2)); and the record indicates that the number of potential purchasers who would be permitted by Federal antitrust laws to acquire the Western Union cables is limited indeed.
 
 
 20
 The other five methods suggested involve the creation of a new corporation, to which would be transferred all the Western Union cables property in return for capital stock. Divestment could then be completed by sale or other distribution of the stock received as consideration for transfer of the cables. If the 'public-sale' method were employed, the stock of the new corporation would be offered to the public, and Western Union would ultimately receive as consideration for divestment of its international telegraph operations the proceeds derived from sale of the stock. The 'sale-to-stockholders' method contemplates first offering the stock of the new corporation to the stockholders of Western Union, and then selling any remaining shares to the public.
 
 
 21
 The 'spin-off' method would require share-for-share distribution of the stock of the transferee corporation to Western Union shareholders, so that each would then own the same number of all authorized shares of the new corporation as of Western Union. The 'split-off' method would accomplish the same result of Western Union stockholder ownership, but the shares of the newly-created corporation would be transferred to Western Union stockholders in exchange for a pro rata portion of the Western Union shares held by each stockholder.
 
 
 22
 Divestment by the 'split-up' method would necessitate the creation of two new corporations, one of which would be the transferee of Western Union's international cable operations, and the other of Western Union's landline operations. Western Union stockholders would thereupon exchange their Western Union stock for the stock of each of the two new corporations. Either the spin-off, split-off or split-up method of effecting divestment could be followed without the necessity of fixing a figure as the value of the Western Union cables, since each Western Union stockholder would have the same pro rata interest in both Western Union landlines and Western Union cables following divestment, as prior to divestment.
 
 
 23
 Throughout the proceeding Western Union has pointed to the Anglo cables lease expiring in 2010 as an obstacle to every suggested method of divestment. Assignment of the lease is forbidden by its terms unless Western Union's 'present and future landline system' accompanies the assignment, and then is permitted only on the condition that the assignee be a 'responsible company' acceptable to the lessor, and the further condition that Western Union continue liable for performance of the covenants of the lease, which 'shall be construed and take effect as a lease made in England and in accordance with the laws of England.'
 
 
 24
 The decision of the Commission recognizes that if the cables lease is to be transferred, which must be done in order to accomplish divestment, then according to the provisions of the lease Western Union must not only remain contingently liable for another fifty years, but must also assign its landlines, which cannot be done, since they are integral to its domestic operations. But the Commission concludes as to this that, 'while the Anglo lease as presently worded presents an impediment to divestment under the provisions of Section 222(c)(2), inability to secure a modification of the lease to remove such impediment has not been demonstrated. The lease, therefore, cannot be regarded as excusing Western Union from its duty to divest.'
 
 
 25
 In the proceeding before the Commission which culminated in the order under review, the American competitors of Western Union cables, namely, American Cable & Radio Corporation with its three subsidiaries, and R.C.A. Communications, Inc., intervened in opposition to petitioner. American Communications Association, an organization of Western Union employees, intervened in support of petitioner. Hearings were had in 1952 and 1953, and a final hearing on March 25, 1954. In December of 1954 the Hearing Examiner released his 'Initial Decision.' Exceptions and replies to exceptions were filed, and at length oral argument was heard before the Commission en banc on May 13, 1957. Meantime Western Union moved to reopen the record for testimony as to negotiations with 'noncommunications entities' during the period from the closing of the record on March 25, 1954, until April 16, 1957, but the Commission declined to reopen the evidence.
 
 
 26
 Upon the facts found from the record as closed on March 25, 1954, embracing some 3,000 pages of testimony and voluminous documentary evidence, the Commission concluded inter alia that 'methods of divestment are available, within the framework of existing statutes, which are lawful, feasible, and in the public interest'; that 'Western Union has not exercised due diligence in bringing about divestment of its international telegraph operations'; and that the order of September 27, 1943, should be modified 'so as to give Western Union until December 31, 1958, within which to present to the Commission for its approval a plan of divestment which can be consummated under statutes in effect, and which will accomplish the purpose and intent of Section 222(c)(2) * * *' The findings and conclusions thus reached serve as predicate for the order of July 9, 1958, the operation of which we have suspended pending the determination of this review. 5 U.S.C.A. 1039(b).
 
 
 27
 Western Union's petition to review challenges the validity of this order upon sixteen separate grounds, which are fairly summarized in petitioner's brief under three points: (1) that the Commission 'had no power or jurisdiction to make the order'; (2) that 'none of the methods of divestment suggested by the Commission as available is permitted or required by the Act or feasible'; and (3) that 'assuming the Commission had statutory power to make the order under review, arbitrariness, capriciousness and unreasonableness require that it be set aside.'
 
 
 28
 All parties concede that the source of the power of the Commission to make the order in question must be found in 222(c)(2) of the Communications Act. (47 U.S.C.A. 222(c)(2).) In 1943 the joint petition of Western Union and Postal for approval of the merger pursuant to 222(c)(2) represented to the Commission that:
 
 
 29
 'Western Union agrees, as a part of such consolidation or merger, that it will exercise due diligence in bringing about as promptly as it reasonably can the divestment of the international telegraph operations carried on by it at the time of the consolidation or merger, such divestment to be within a reasonable time to be fixed by the Commission, after the consideration for the property to be divested is found by the Commission to be commensurate with its value, and as soon as the legal obligations of Western Union will permit.' (See 10 F.C.C. at 154.)
 
 
 30
 The Commission's order of September 27, 1943, issued in response to the petition of Western Union and Postal, directed Western Union to 'exercise due diligence in bringing about the divestment of its international telegraph operations * * * as promptly as it reasonably can, and in no event later than 1 year from the date hereof,' and provided also that 'the time fixed is subject to extension only after a satisfactory showing * * * that such divestment cannot reasonably be effected within the time herein fixed, and that due diligence has been exercised as herein required.' (10 F.C.C. at 171.)
 
 
 31
 The order of July 9, 1958, modifies the 1943 order to require that a plan for divestment be presented for approval within a definite time, and that the plan so presented shall provide for divestment 'within a period of not more than 6 months from the date of the approval of of the plan by the Commission.'
 
 
 32
 Western Union has never questioned the power of the Commission to make the order of September 27, 1943, from which no appeal was taken, but per contra acquiesced in that order and, as before stated, has applied for and received annual extensions and made quarterly progress reports thereunder. Cf.: City of Tacoma v. Taxpayers of Tacoma, 1958, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345; Columbia Broadcasting System v. United States, 1942, 316 U.S. 407, 415-425, 62 S.Ct. 1194, 86 L.Ed. 1563.
 
 
 33
 Now petitioner asserts that the modifying order of July 9, 1958 is invalid because 'the Commission has no power to fix a 'reasonable' time to effect divestment until after two things have happened, namely, (1) it has found the consideration to be received 'commensurate with the value' of the property to be divested and (2) the legal obligations of petitioner permit the divestment.'It is plain, however, that the order under review does not itself fix a time for divestment, but specifies when a proposed plan for divestment is to be presented and requires that the plan, if approved, provide for divestment within six months following approval. The presumption is of course that approval will not come to pass unless and until a plan is presented which meets the two requirements of the statute that 'the consideration for the property to be divested is found by the commission to be commensurate with its value,' and 'the legal obligations, if any, of the carrier to be so divested will permit.' 47 U.S.C.A. 222(c)(2); see Hall v. Geiger-Jones Co., 1917, 242 U.S. 539, 554, 37 S.Ct. 217, 61 L.Ed. 480.
 
 
 34
 If, as petitioner must and does concede, the Commission has continuing jurisdiction to compel Western Union to 'exercise due diligence in bringing about such divestment as promptly as it reasonably can,' as 222(c)(2) expressly directs, then it follows that in directing petitioner to submit a plan of divestment the order of July 9, 1958 is within the powers conferred upon the Commission, since, as respondents point out, the very power to require the exercise of due diligence necessarily includes the power to require submission of some plan under the circumstances of this case. Moreover, 4(i) of the Communications Act additionally empowers the Commission to 'perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions.' 47 U.S.C.A. 154(i); cf. United States v. Storer Broadcasting Co., 1956, 351 U.S. 192, 202-203, 76 S.Ct. 763, 100 L.Ed. 1081.
 
 
 35
 Here the order is predicated in part upon the Commission's finding that petitioner has heretofore failed to 'exercise due diligence in bringing about such divestment as promptly as it reasonably can.' 47 U.S.C.A. 222(c)(2). Western Union complains of that finding, pointing to the fact that from the September 27, 1943 order until commencement of the instant proceeding, annual petitions for extensions of time and 36 quarterly reports were filed and, throughout that period, the Commission 'failed to direct action or criticize inaction,' but in each of the annual extension orders specifically found that 'such divestment cannot reasonably be effected by (the date previously fixed) * * * and that due diligence has been exercised as required * * *'.
 
 
 36
 Petitioner complains further that the finding of lack of due diligence was made notwithstanding that, following the closing of the record on March 25, 1954, the Commission denied petitioner's motion to reopen the record to receive testimony as to Western Union's efforts to effect divestment during the three years and more that intervened between the 1954 closing of the record and the 1957 argument before the Commission en banc. These motions to reopen were denied, says petitioner, notwithstanding the Commission's attention was directed to the fact that its deliberations in this proceeding must be limited to a consideration of the 1954 record, since 1.859 of the Rules of the Commission provide that: 'The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision.' See also: 5 U.S.C.A. 1037(a); I.C.C. v. Louisville & Nashville R. Co., 1913, 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431; United States v. Baltimore & Ohio South-western R. Co., 1912, 226 U.S. 14, 20, 33 S.Ct. 5, 57 L.Ed. 104.
 
 
 37
 It is unnecessary to read the voluminous record here to ascertain whether the evidence supports the Commission's finding that 'Western Union has not exercised due diligence in bringing about divestment of its international telegraph operations' (see: N.L.R.B. v. Babcock & Wilcox Co., 1956, 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975; Pinellas Broadcasting Co. v. F.C.C., 97 U.S.App.D.C. 236, 230 F.2d 204, certiorari denied 1956, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869), since in our opinion whether or not due diligence was exercised in the past could have but little bearing upon the validity of the order under review, which makes no attempt to impose sanctions for past omissions, but looks wholly to the future and is entirely prospective in operation and effect.
 
 
 38
 However, we should notice petitioner's insistence that it is for the Commission to direct what shall be done in the exercise of due diligence, remembering Western Union's proffered excuse that the Commission 'did not ever order or even suggest that petitioner should do something other than or in addition to what it reported to the Commission from 1943 to 1952.' The obvious answer is that under the express mandate of 222(c)(2) to 'exercise due diligence in bringing about such divestment as promptly as it reasonably can,' the duty of taking the initiative has rested with Western Union at all times since the order of September 27, 1943.
 
 
 39
 Due diligence requires reasonable and good faith effort to accomplish an end or purpose at the earliest practicable time. As applied to the proceedings at bar, due diligence required and now requires that Western Union continually employ on its own initiative reasonable and good faith efforts to accomplish divestment at the earliest practicable time. Thus the burden of carrying the initiative in evolving, formulating and presenting plans for divestment rests constantly upon the shoulders of petitioner until either divestment as contemplated by 222(c)(2) is accomplished with Commission approval, or the Commission finds that divestment in keeping with the conditions specified in the statute is unfeasible or impossible.
 
 
 40
 In enacting the 1943 congressional mandate to 'exercise due diligence in bringing about such divestment' as promptly as reasonably possible (47 U.S.C.A. 222(c)(2)), the Congress realized, as has the Commission in attempting to enforce the mandate, that the terms of the lease from Anglo of five of Western Union's ten Atlantic cables present obstacles which must be overcome to the extent necessary to permit divestment to be accomplished. (See: Hearings before Sub-committee of Senate Committee on Interstate and Foreign Commerce, 77th Cong., 2d Sess., pp. 87 et seq. (1942); House Rep.No. 2664, 77th Cong., 2d Sess., pp. 4, 68, 180 (1942); Application for Merger, supra, 10 F.C.C. at 153.)
 
 
 41
 Foremost among these obstacles is the provision which forbids assignment of the lease unless Western Union's 'present and future landline system' accompanies the assignment. There can be no doubt that any plan for divestment must be conditioned upon the willingness of the lessor to waive this requirement. The Commission points out, however, that the conditions relating to assignment are but a means to the end of assuring that the cables will remain in the hands of a financially stable entity, and that Anglo will continue to have access to a United States landline system. It should be noted too that there appears ample support in the record for the Commission's conclusion that 'inability to secure a modification of the lease to remove such impediment has not been demonstrated.'
 
 
 42
 Western Union urges that the lease provision for continuing liability of the lessee in the event of assignment is also an obstacle to divestment, but we agree with the Commission that 'Western Union cannot refuse to divest solely because it would be required to retain a guarantor's liability with respect to property in which it would no longer hold an interest.' Cf. United Gas Improvement Co. v. S.E.C., 3 Cir., 1943, 138 F.2d 1010, 1018.
 
 
 43
 It is true of course that the congressional desire to divorce completely Western Union's virtual landline monopoly, following the merger, from all financial interest in international telegraph operations, cannot be achieved perfectly so long as Western Union is contingently liable on the Anglo cables lease. However, it is plain from the legislative history of 222(c)(2) that the Congress never contemplated perfect divorcement. Moreover, application for merger was made with certain knowledge, not alone that divestment would surely be obligatory to the extent reasonably possible of achievement, but also that release of Western Union from contingent liability for performance of the financial obligations of the cables lease was, as a practical business matter, most unlikely.
 
 
 44
 Contingent liability of Western Union following a permissible assignment of the cables lease is not one of the 'legal obligations' which the Congress contemplated as a possible impediment to divestment. (See 47 U.S.C.A. 222(c) (2).) So the Commission correctly concluded that Western Union must continually take the initiative and exercise due diligence to accomplish divestment, even though every feasible plan contemplates that Western Union remain contingently liable on the Anglo lease.
 
 
 45
 Turning next to petitioner's contention that 'none of the methods of divestment suggested by the Commission as available is permitted or required by the Act or feasible,' it is neither necessary nor desirable for this Court to indicate an opinion at this time as to any of the suggested possible methods of divestment, other than to express agreement with the Commission that 'Congress did not limit the method of divestment of Western Union's international telegraph operations to that of sale only,' and to state our view that transfer of the cables for all the stock of a new corporation may be 'consideration for the property to be divested * * * commensurate with its value,' and that subsequent exchange or distribution of such stock by Western Union to its stockholders, as part of a plan of divestment, would not make the stock any the less 'consideration for the property to be divested' within the meaning of 222(c)(2).
 
 
 46
 Since the statute leaves selection of a plan of divestment to Western Union subject to Commission approval, decisions involving methods of compulsory divestment under the Federal antitrust laws (15 U.S.C.A. 1 et seq.; see, e.g.: Continental Ins. Co. v. Reading Co., 1922, 259 U.S. 156, 177, 42 S.Ct. 540, 66 L.Ed. 871; United States v. Union Pac. R. Co., 1913, 226 U.S. 470, 33 S.Ct. 162, 57 L.Ed. 306), and under the Public Utility Holding Company Act (15 U.S.C.A. 79 et seq.; see, e.g.: North American Co. v. S.E.C., 1946, 327 U.S. 686, 709, 66 S.Ct. 785, 90 L.Ed. 945, affirming 2 Cir., 1943, 133 F.2d 148; In re Standard Gas & Elec. Co., 3 Cir., 1945, 151 F.2d 326, 329-330, certiorari denied Guaranty Trust Co. of New York v. S.E.C., 1946, 327 U.S. 796, 66 S.Ct. 820, 90 L.Ed. 1022), are not controlling, but at most only suggestive, here.
 
 
 47
 By declining the express opinion as to the feasibility of any of the suggested methods, we do not of course intimate disagreement with the Commission's finding that 'methods of divestment are available * * * which are lawful, feasible and in the public interest.' And as we have seen, the Commission has the power and the duty to order Western Union to come forward with plan after plan in the exercise of due diligence, until a feasible plan of divestment as contemplated by the statute is found, assuming of course one ultimately can be found. As to the latter, we need not offer any speculation as to the future, or any opinion as to the past, based upon the 1954 record here.
 
 
 48
 While mindful of the limited scope of judicial review where the Commission has made a choice of 'means of achieving the statutory policy' (American Power & Light Co. v. S.E.C., 1946, 329 U.S. 90, 112, 118, 67 S.Ct. 133, 146, 91 L.Ed. 103; Danielson v. Civil Aeronautics Board, 2 Cir., 1952,204 F.2d 266), we are nonetheless persuaded that the order of July 9, 1958, is without statutory warrant in fixing an unconditional deadline for submission of a plan of divestment, without regard to whether exercise of due diligence could produce, within the time fixed, a feasible plan which would meet the two requirements of the statute that 'the consideration for the property to be divested * * * be commensurate with its value,' and that Western Union's 'legal obligations' under the Anglo cables lease 'permit.' 47 U.S.C.A. 222(c)(2).
 
 
 49
 Absent an affirmative finding that due diligence could produce within a specified period a feasible plan which would include modification of the Anglo cables lease to permit assignment without transfer of landlines (cf. Application for Merger, supra, 10 F.C.C. at 154), the Commission cannot reasonably fix a deadline certain for presentation of any plan of divestment, except an otherwise permissible plan conditioned upon obtaining consent of the lessor to an assignment without transfer of landlines.
 
 
 50
 Accordingly, we are of the view that any order of the Commission fixing the time for presentation of a plan of divestment may either (1) direct that an unconditional plan be submitted if and when, but only if and when, after continual exercise of due diligence, a feasible plan can be formulated which will meet the two stated conditions of the statute as interpreted by the Commission, or (2) require submission of a conditional plan by a date certain, subject inter alia to obtaining consent of the lessor to assignment of the cables lease without transfer of landlines.
 
 
 51
 Realization by petitioner that the burden rests upon Western Union to carry the initiative at all times, and to submit plan after plan if necessary until either divestment is accomplished or the Commission finds that divestment as contemplated by 222(c)(2) is unfeasible or impossible, as well as the possible penalty of a $500 fine 'for each and every day' of willful violation (47 U.S.C.A. 502) of the Commission's orders to 'exercise due diligence in bringing about such divestment as promptly as it reasonably can' (id. 222(c)(2)), should hasten the day of fulfillment of the 1943 mandate of the Congress. Experience teaches judges that the best of all possible justice is usually that achieved through consensual agreement by the parties themselves. It is not too much to expect that here Western Union could find a more satisfactory and businesslike means of divestment under its own initiative than by awaiting the compulsion of a choice dictated by order of the Commission.
 
 
 52
 In the face of the years that have gone since the Commission's original order of September 27, 1943, petitioner should not be heard to complain that action is now pressed. Continuing ownership and operation of Western Union cables, along with virtual monopoly of the landlines, cannot but hinder fair and equitable administration of the 'formula' adopted pursuant to 222(e)(1) of the Act. 47 U.S.C.A. 222(e)(1); see The Western Union Telegraph Co. v. United States, 2 Cir., 1954, 217 F.2d 579.
 
 
 53
 For the reasons stated, the Commission's order of July 9, 1958, will be set aside and the matter recommitted to the Commission for further proceedings not inconsistent with this opinion. 5 U.S.C.A. 1039(a); see 28 U.S.C. 2106.
 
 
 
 [1]
 United States District Judge for the Southern District of California, sitting by designation