544 F.2d 87
 WESTERN UNION INTERNATIONAL, INC., Petitioner,
v.
The FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
The Western Union Telegraph Company et al., Intervenors.
 No. 6, Docket 75-4132.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 13, 1976.
Decided Oct. 20, 1976.
 
 Alvin K. Hellerstein, New York City (Stroock & Stroock & Lavan, Henry J. Silberberg, Alan Kolod, Robert E. Conn, and Roger P. Newell, New York City, on the brief), for petitioner.
 Joseph A. Marino, Washington, D. C. (Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Lawrence S. Schaffner, Counsel, F. C. C., Washington, D. C., Thomas E. Kaufer, Asst. Atty. Gen., Carl D. Lawson, and Lee I. Weintraub, Dept. of Justice, Washington, D. C., on the brief), for respondents.
 Charles P. Sifton, New York City (LeBoeuf, Lamb, Leiby & MacRae, John S. Kinzey, Howard A. White, and John A. Ligon, New York City, on the brief), for intervenor ITT World Communications, Inc.
 Rosel H. Hyde, Herbert E. Marks, Michael B. Green, Wilkinson, Cragun & Barker, Washington, D. C., on the brief for intervenor State of Hawaii.
 Milton Black, New York City (Mudge, Rose, Guthrie & Alexander, New York City, Donald J. Zoeller, Joseph H. Stallings, Jack Werner, New York City, and Joel Yohalem, Washington, D. C., on the brief), for intervenor The Western Union Telegraph Co.
 Before ANDERSON, MANSFIELD and MULLIGAN, Circuit Judges.
 ROBERT P. ANDERSON, Circuit Judge:
 
 
 1
 This is a petition for review of a memorandum opinion and order of The Federal Communications Commission (FCC) in the matter of The Western Union Telegraph Co., 55 F.C.C.2d 668 (1975). The FCC decided that Western Union Telegraph Co. (WU) might apply for authority, pursuant to 47 U.S.C. § 214 (1970), to lease and operate facilities between the 48 contiguous United States and the District of Columbia, and the State of Hawaii for the purpose of extending WU's mailgram service to Hawaii. For the reasons set out below, the FCC's order is set aside.
 
 
 2
 A mailgram, in the words of the FCC opinion, is essentially "electronic mail." The message is picked up from a customer by various means, including telephone, telex, over-the-counter and messenger. The mailgram is then transmitted over WU circuits to its computer switching center in Middletown, Virginia. There the computer routes the mailgram over circuits specifically dedicated to this particular service, to a preselected Post Office, where a postal employee takes the message from the teleprinter and puts it in the regular mails.
 
 
 3
 Mailgram service within the continental United States began on January 1, 1970 for an experimental, two-year period, United Telegraph Workers, AFL-CIO v. FCC, 141 U.S.App.D.C. 190, 436 F.2d 920, 921 (1970). At the time of the FCC order in this case, there were pending before it applications for authority to provide a service similar to mailgrams filed by RCA, ITT, WUI (totally separate company from WU), the Hawaiian Telephone Co. in connection with WU and The Domestic Satellite Corp.
 
 
 4
 The contemporary American telegraph industry is made up of domestic and international "record carriers." WU is the sole domestic carrier of telegrams, while international record carriers (IRCS), which include Petitioner WUI and intervenor ITT World Communications, Inc. (ITT), traffic only in messages between the continental United States and abroad. For the purposes of accepting and delivering international telegraph messages, IRCS may maintain public offices, pursuant to 47 U.S.C. § 222(a)(5), in certain FCC-designated cities of the United States known as "gateway" cities. Messages for delivery abroad which originate within the United States in other than gateway cities will generally be placed with a local WU office in the "hinterland." From there, the message will travel by WU lines to an office of an IRC and thereafter to its final destination abroad. WU distributes messages placed with it for foreign delivery with competing international carriers by use of a formula derived pursuant to 47 U.S.C. § 222(e)(1).
 
 
 5
 This peculiar industry structure came about primarily through the enactment, in 1943, of 47 U.S.C. § 222, which deals with the permissive consolidations and mergers of telegraph carriers. WU came within the provisions of this statute as a result of its 1943 merger with the failing Postal Telegraph Co., Western Union Divestment, 30 F.C.C. 323, 325 (1961). Section 222(b)(1) allows the merger or consolidation of any two or more domestic telegraph carriers, but § 222(c)(2) goes on to provide in pertinent part:
 
 
 6
 "(2) Any proposed consolidation or merger of domestic telegraph carriers shall provide for the divestment of the international telegraph operations theretofore carried on by any party to the consolidation or merger, within a reasonable time to be fixed by the Commission . . . ." (Emphasis added.)
 
 
 7
 International telegraph operations are defined by the statute as "record communications by wire or radio" originating or terminating at points outside the "continental United States." 47 U.S.C. § 222(a)(6). By a 1960 amendment to 47 U.S.C. § 222(a)(10), Congress defined the continental United States as the States of the Union and the District of Columbia, but, for this purpose, excluded Hawaii. See 2 U.S.Code Cong. & Admin.News, pp. 2963, 2979-80 (1960). Telegraph traffic with Hawaii was thus classified as an international operation open only to IRCS.
 
 
 8
 Given this background, the Common Carrier Bureau, in an April 19, 1972 decision by its Chief, initially disallowed WU's application to provide mailgram service to Hawaii. The Bureau's decision was grounded on its interpretation of the legislative history of § 222, which led it to conclude that Congress' intent in enacting "the divestment requirement set out in Section 222(a)(2) (sic) . . . (was) to preclude WUTC from engaging in future 'international telegraph operations' as that term is defined in Section 222." The Bureau thus rejected an argument, posited by WU, and renewed by it before this court, that when Congress provided in § 222(c)(2) that a merged domestic telegraph carrier was to divest itself of international telegraph operations "theretofore carried on," it was intended only that WU divest itself of international services and operations in existence as of 1943, the effective date of the statute and of the WU-Postal Telegraph merger. It further argued that, because mailgrams were not in existence in 1943 and could, therefore, be called a "new" service, different from the traditional telegraph operations carried on in 1943, § 222(c)(2) did not apply to the present case. In addition to the legislative history, the Bureau relied on the FCC's decision in Telegraph Service with Hawaii, 28 F.C.C. 599 (1960), discussed infra.
 
 
 9
 The FCC's reversal of the Common Carrier Bureau's decision entailed a finding that Congress' concern in 1943 was simply "to remedy the problems which were (then) facing the troubled telegraph industry . . .," The Western Union Telegraph Co., supra, 55 F.C.C.2d at 672, so that it could find
 
 
 10
 ". . . nothing in the statute or its legislative history which mandates a broad interpretation of the divestment clause such as to disqualify WU from providing the proposed Mailgram service to Hawaii." Id. at 671.
 
 
 11
 The FCC first argued for a reading of the divestiture section, § 222(c)(2), consistent with other sections of the Communications Act, setting down only "broad legislative goals" and allowing the FCC broad and flexible powers to achieve those goals "in the light of changing circumstances." Secondly, the FCC found in an appendix to its opinion that the "theretofore" language of the divestiture requirement "should be interpreted to apply only to the types of operations engaged in by WU at the time of the merger in 1943." Id. at 677. Accordingly, the FCC held that it had the authority to allow WU to re-enter international operations for the first time since divestment of the company's international facilities in 1963, because mailgrams were a new service distinct from those offered in 1943.
 
 
 12
 The FCC is correct in presenting for decision here, only the "narrow legal question" of whether § 222(c)(2) constitutes a ban on the potential re-entry of WU into international operations through the company's application for mailgram service to Hawaii. A review of the FCC's legal conclusions and the rationale leading up to them, FCC v. RCA Communications, Inc., 346 U.S. 86, 91, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), disclose that the Commission erred in deciding the issue as it did.
 
 
 13
 In determining the meaning of § 222, it is necessary to give careful consideration to its legislative history. Train v. Colorado Public Interest Group, 426 U.S. 1, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976); Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); Federal Maritime Commission v. DeSmedt, 366 F.2d 464, 469 (2 Cir. 1966), cert. denied, 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 437 (1966). The origins of § 222 lie primarily in the economic difficulties facing the American telegraph industry during the depression of the 1930's. Most affected of the large domestic telegraph carriers was Postal Telegraph Co., which borrowed heavily from The Reconstruction Finance Corporation but, in spite of this aid, continued on the verge of financial collapse. Under these circumstances Congress, in 1939, launched a study of the telegraph industry with the passage of Senate Resolution 95. That study, reported as S.Rep. No. 769 (Study of the Telegraph Industry ), 77th Cong., 1st Sess. (1941), resulted in the recommendation that Congress allow domestic American telegraph carriers to merge, but with a proviso that ". . . there should be no merger between or common control of domestic and international communications carriers but permitting a merger of domestic carriers into one entity and international carriers into a second and entirely separate and distinct entity . . . .." Id. at 25. As to operations of the merged entity, the Committee proposed:
 
 
 14
 "(d) The legislation should define 'domestic' and 'international' carriers and shall not prevent the inclusion of all existing operations of any domestic carrier, which may be engaged partially in international telegraph communications, into the merged domestic enterprise, and shall empower the Federal Communications Commission eventually to require the merged domestic carrier to restrict itself solely to domestic telegraph operations if found to be in the public interest." Id. (Emphasis added.)
 
 
 15
 The reasons for such restrictions on the merged domestic carrier was that, with the demise of Postal Telegraph Company, WU was expected to acquire a monopoly in "ordinary commercial messenger business within the United States." Id. at 20. WU also had extensive international operations. It could, therefore, by coordinating both aspects of its business, seriously damage the interests of competing international carriers, contrary to 47 U.S.C. § 314.
 
 
 16
 These Senate recommendations were embodied in S. 2445 a proposed, but not enacted, version of § 222 which would have allowed the merger of domestic and international carriers, respectively, into two separate entities. As for the restriction on international operations placed on the domestic carrier, the language of this bill was changed to "require" the FCC to bring about complete divestment "of all such international telegraph operations." Hearings on S. 2445 Before a Sub-Committee of the Senate Committee on Interstate Commerce, (Consolidations and Mergers of Telegraph Operations) 77th Cong., 2d Sess. at 253 (1942). The final version of § 222(c)(2), quoted supra, left the FCC with only the authority to fix the time for divestiture. In short, the evolving language of the statute itself militates against a reading of § 222(c)(2), as the FCC read it, to make it consistent with other sections of the Communications Act which furnish only broad legislative goals and give the FCC "broad and flexible powers to achieve those goals in the light of changing circumstances." Instead, in enacting this governing statute, Congress granted the FCC only the power to fix, in its discretion, the time within which the divestiture of international operations by domestic merged entities was to be accomplished. Should the FCC wish further broad and flexible powers to adapt to changed circumstances, as may be the case here, Congress, and not this court, must be the one to grant the essential power.
 
 
 17
 Subsequent interpretations of § 222(c)(2) by the FCC bear out the Commission's lack of discretion in applying this statute. In Telegraph Service with Hawaii, 28 F.C.C. 599, 605, aff'd on reconsideration, 29 F.C.C. 714 (1960), the FCC ruled that § 222 did not allow WU to provide telegraph service to the islands upon Hawaii's admission as a State as part of WU's domestic telegraph operations. The FCC there felt that WU's interpretation of the statute, which would have included an evaluation of the public interest in allowing such a service, was incorrect. Instead, the FCC found that the history and purpose of § 222 did not give rise to any "doubts as to meanings" so that the FCC could not allow WU to provide such a service "no matter how urgent the public interest." 28 F.C.C. at 605. Again Congress was there cited as the only competent body to deal with WU's request. Further, one year after its decision in Telegraph Service with Hawaii, supra, the FCC found in Western Union Divestment, 30 F.C.C. 323, 340 (1961), that it was the intent of Congress in enacting § 222 to achieve a complete divorcement of domestic carriers from all financial interest in international telegraph operations. The FCC's 1960 and 1961 reading of § 222 are simply inconsistent with its current view[1] by which the Commission has now endowed itself with the power to include an evaluation of the public interest in allowing WU to file its application for mailgram service an admittedly international operation by a domestic carrier. Accordingly, no special weight can be placed on the FCC's latest interpretation of § 222, United Housing Foundation Inc. v. Forman, 421 U.S. 837, 858 n. 25, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), as would otherwise be the case, Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 121, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).
 
 
 18
 Continuing the analysis of the legislative history of § 222, we now turn to the second issue raised by the FCC order which is whether § 222(c)(2)'s divestiture requirement applied only to record (non-voice) services provided by WU in 1943. This construction of § 222 would allow WU to apply for mailgram service to Hawaii, because the FCC has found that while the mailgram is "clearly a record service," it is nonetheless a "new service distinct from those offered in 1943." Implicit therein is the view that the statute was solely applicable to the industry's problems and operations literally and precisely as they existed in 1943 and that the legislation was not meant to have any prospective application. This court is satisfied, however, that there is no basis whatever in the legislative history to support so limited and strained a construction.
 
 
 19
 The 1942 congressional hearings on S. 2445, one of two predecessors to the current § 222, reveal that the FCC at that time considered the legislation as the beginning of a major and long-term reorganization of the telegraph industry. FCC Chairman James L. Fly told the Committee that:
 
 
 20
 "As time has gone on, I must say that I have become more and more impressed with the utter necessity, and I think at an early date, of having an effective worldwide scheme of communications. . . . (The need) is pretty acute in time of war. . . .
 
 
 21
 But it is going to be immensely important when this war is over." Hearings on S. 2445 Before a Sub-Committee of the Senate Committee on Interstate Commerce, (Consolidations and Mergers of Telegraph Operations) 77th Cong., 2d Sess. at 253 (1942).
 
 
 22
 FCC Commissioner Clifford T. Durr, likewise saw the legislation as a "long step" toward the creation of a domestic industry comprised of only a single domestic and a single international carrier. Id. at 14. Moreover, around this time the affected domestic companies, including WU, evidently suggested that they be allowed to retain "international facilities." Chairman Fly disagreed and said:
 
 
 23
 "I strongly feel that we ought to do a clean job of handling this problem. . . . (I)f we decide that as a matter of policy that there should be a domestic monopoly . . . then I do think we ought to do a clean job of it." Id. at 258.
 
 
 24
 At the urging of the Navy Department, however, S. 2445 was changed from a measure authorizing mergers of both domestic and international carriers to one allowing only mergers among domestic carriers. S.Rep. No. 1490, 77th Cong., 2d Sess. at 8 (1942). At the House hearings on the new measure, S. 2598, FCC Chairman Fly again commented that "we do not want the domestic company to have any international arrangements; that is, any international properties or operations." Hearings Pursuant to S. 2598 Before a Subcommittee of the House Committee on Interstate & Foreign Commerce, (Consolidations and Mergers of Telegraph Operations), 77th Cong., 2d Sess. at 16 (1942).
 
 
 25
 The plain import of these statements, when taken together with the evolving language of the statute as discussed supra, leads to the conclusion that the intent and purpose of Congress in enacting § 222(c)(2) was more than simply barring domestic carriers from engaging in the particular international operations and services that were being provided in 1943. The FCC's heavy reliance on the "theretofore" language of § 222(c)(2), supra, is, therefore, unjustified. The word "theretofore" must be placed in its proper context by looking at the legislative history as a whole, Tidewater Oil Co. v. United States, 409 U.S. 151, 157, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972), which does not reveal an intent by Congress to use the word as a line of demarcation for the types of international record services which WU could or could not engage in after the merger with Postal Telegraph. To hold otherwise would not only give the word "theretofore" a strained meaning, but would imply that WU could defeat the import of the congressional scheme of § 222 by re-entering international operations shortly after its mandated divestiture by developing or acquiring interests in modes of record communications, other than standard telegraph service, not engaged in by the company in 1943. See also, The Western Union Telegraph Co., supra, 55 F.C.C.2d at 680. Congress was, of course, aware of forms of record message services other than telegrams during the period when this legislation was under study, including the Bell System's TWX, a teletypewriter exchange service, and its leased-wire service. See Recommendations of Three Proposed Amendments to the Communications Act of 1934, H.Doc. No. 83, 74th Cong., 1st Sess. at 5 (1935) and Hearings Pursuant to S. No. 95 Before a Subcommittee of The Senate Committee on Interstate Commerce, (Statement of FCC Chairman Fly), 77th Cong., 1st Sess. at 5, 19 (1941).
 
 
 26
 It is clear that in 1962 WU was in full agreement with this court's present interpretation of § 222(c)(2). This is evidenced by WU's attempt in that year to being about the repeal of that section. The thrust of the bill, which was never enacted into law, was to allow WU to compete with A. T. & T. by engaging in international data transmission, which, like mailgrams, was a new type of record service. The FCC opposed such a repeal. This action shows that at that time the FCC was of the opinion that § 222(c)(2) was intended to preclude WU from engaging in international record services in existence prior and subsequent to 1943.
 
 
 27
 In short, § 222(c)(2)'s directive as to the divestment by the merged domestic carrier (WU) of "international telegraph operations theretofore carried on by any party to the consolidation or merger" was meant as a continuing bar to WU's involvement in international record communications which would include mailgrams. This was the price paid by the company for the acquisition of a domestic monopoly over telegraph service. Accordingly, the issue of whether mailgrams are a "new" form of record service unknown to the drafters of the 1943 legislation need not be reached or discussed.
 
 
 28
 Thus, consistent with the Circuit's earlier opinion in Western Union Telegraph Co. v. United States, 267 F.2d 715, 718 (2 Cir. 1959), § 222(c)(2) precludes the FCC's consideration of an application by The Western Union Telegraph Co. to provide an admittedly international record service to Hawaii. In the light of the disposition of the case, the merits of antitrust allegations urged by intervenor ITT World Communications Inc. need not be discussed or commented upon.
 
 
 29
 Because it was Congress that enacted the statute and imposed this ban on WU, it is only Congress that, under the circumstances of this case, can change it.
 
 
 30
 The order of the FCC is vacated and set aside.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 31
 I respectfully dissent for the reason that both the plain language of § 222 of the Federal Communications Act of 1934 ("Act") and the circumstances surrounding its enactment make it clear that in authorizing Western Union Telegraph Company ("WU") and Postal Telegraph, Inc. ("PT") to merge, Congress did not bar the merged enterprise from ever again entering into any international operations. If Congress had wished to enact such a prohibition, it could easily have done so. All it had to do was to provide that following divestiture the merged enterprise should not engage in international operations or that it should be restricted to domestic service. But it did not do this. Instead, it simply required that the merged enterprise divest itself of those "international operations theretofore carried on." The term "theretofore" can only mean "up to that time," "until then," or "before then," see Webster's Third International Dict. (1961 ed.) 2372; Hume v. United States, 118 F. 689, 696 (5th Cir. 1902). It cannot fairly be construed as meaning "thereafter." As the Supreme Court has stated, "It is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written." United States v. Great Northern Railway Co., 343 U.S. 562, 575, 72 S.Ct. 985, 993, 96 L.Ed. 1142 (1952). "(W)e are not free to adopt a construction which not only strains, but flatly contradicts, the words of the statute," Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 427, 92 S.Ct. 596, 601, 30 L.Ed.2d 575 (1972).
 
 
 32
 Congress thus left open the question of whether, with changing market conditions, circumstances and technologies, some international operations by WU might after divestiture be authorized by the Federal Communications Commission as being in the public interest. Since WU has complied with the divestiture requirement, that obligation has been fulfilled, and the FCC is no longer barred from authorizing the proposed mailgram service to Hawaii, an international point. I would therefore affirm the Commission's order.
 
 
 33
 That Congress intended to restrict itself to dealing with the telegraphic industry in its contemporary pattern is attested to not only by the statute's plain language but by the circumstances surrounding the enactment of § 222. Although the statute is couched in terms that embrace any merger of telegraphic carriers generally, it is undisputed that the law was in fact aimed at authorizing the proposed merger of WU with its financially ailing competitor, PT, which had continued to lose money despite government subsidization through the Reconstruction Finance Corp. See H.R.Rep. No. 2664, 77th Cong., 2d Sess. 3-4 (1942), S.Rep. No. 1490, 77th Cong., 2d Sess. 1 (1942). These two companies represented the country's sole domestic telegraphic services except for certain limited types of service (leased wire, teletypewriter and telephone) offered by American Telephone & Telegraph Company. If PT should fail, the United States would lose an essential telegraphic service. Sen.Res. 75, 76th Cong., 1st Sess. 1939. Congressional authority for the proposed merger was required because the merger otherwise would violate § 314 of the Act, 47 U.S.C. § 314.
 
 
 34
 Since the WU-PT merger would create overnight a giant domestic-international telegraphic enterprise possessing a domestic monopoly over pick-up and delivery of international messages, which could be used unfairly to favor its international cables division as against the overseas services of other international carriers, some protection against this immediate potential for abuse was deemed advisable. The means chosen were to require divestiture of the merged company's international operations and, pending divestiture, to impose upon WU a formula for equitable distribution among international carriers of international traffic picked up by WU for transmittal overseas. Not a word was said about depriving the Commission of its discretionary power under § 214 of the Act to authorize in the future such specific international operations by WU as might be found to be in the public interest.
 
 
 35
 Congress thus viewed divestiture as sufficient to eliminate any immediate anticompetitive consequences from the merger and saw the Commission's continued exercise of its broad discretionary powers and expertise as sufficient to safeguard against any reentry by WU that might tend to cause an undue restraint on competition. In the meantime, competition on the part of international carriers would be given a chance to flourish.
 
 
 36
 Normally, where the plain meaning of a statute is clear legislative history, even if indicating a different intent, will not justify a departure from that meaning. See Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). Here, however, the legislative history of § 222, far from lending support to the majority's position, tends to point in the opposite direction. The excerpts of testimony selected by the majority from statements of those who appeared in the course of Committee hearings extending over a period of years are at best ambiguous. Furthermore, being the statements of individuals rather than of Congressional committees or members, they hardly reflect the views of the Senate and House Committees reporting on the proposed legislation, much less those of Congress. When we turn to the Committee reports, as distinguished from such testimony, we find that there was never any recommendation to the effect that the merged enterprise be barred from international operations. At most the Senate Committee on Interstate Commerce recommended that the Commission be given the power to restrict the merged enterprise to domestic operations if such a restriction should be "found to be in the public interest." S.Rep. No. 769, p. 25. Thereafter the successive drafts of § 222 as they progressed through Congress toward final enactment all contained the language "theretofore carried on." See S. 158, 78th Cong., 1st Sess. (1943); S. 2598, 77th Cong., 2d Sess. (1942); S. 2445, 77th Cong., 2d Sess. (1942). Thus the legislative history, to the extent that it sheds any light on the issue, indicates that Congress meant what it said when it used the phrase "theretofore carried on" and left it to the Commission to determine in its discretion whether WU might be permitted to enter the international market "if found to be in the public interest" or, for that matter, whether an international carrier might expand by growth (as distinguished from merger) into the domestic market.[1]
 
 
 37
 Just as divestiture in the antitrust context is not normally a bar to future competition through growth on the part of the divested company, at least in the absence of a specific prohibition against reentry, see, e. g., Maryland & Virginia Milk Producers Assn. v. United States, 362 U.S. 458, 462, 472-73, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 127, 130, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); United States v. Crescent Amusement Co., 323 U.S. 173, 186, 65 S.Ct. 254, 89 L.Ed. 160 (1944), so here Congress was apparently satisfied to allow the Commission to determine in the exercise of its broad authority whether WU might enter the international area, and, if so, to what extent. Any such determination would, of course, require the Commission to weigh the advantages to the public of permitting a specific or limited reentry against any risk of abuse of domestic monopoly power on the part of WU. As competitive conditions, marketing methods and technology (including the development of alternate-voice data transmission) might change, such flexibility would be both desirable and in the public interest, especially since new methods of protecting international carriers against unfair competition might be devised. For instance, it now appears that the FCC could promote competition in the transmittal of mailgrams to Hawaii (1) by expanding the international gateways in the United States and permitting international carriers to absorb the cost of transmitting messages domestically by phone, telex or TWIX to such gateways, thus providing "paid direct access" to all domestic points in the United States, see International Record Carriers' Communications, 40 F.C.C.2d 1082, 1083 (1973), and (2) by granting Hawaii mailgram rights to one or more international carriers.[2] In view of these changing circumstances, § 222, to the extent that it might restrain competition on the part of WU against the international carriers, should be construed strictly, see United States v. Masonite, 316 U.S. 265, 280, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942).
 
 
 38
 Nor does Telegraphic Service With Hawaii, 28 F.C.C. 599, affd. on reconsideration, 29 F.C.C. 714 (1960), provide any substantial support for the majority's construction of § 222. Although the Commission in that proceeding stated in passing that § 222 precluded WU from engaging in competition with international carriers to overseas points, the statement was made in connection with its consideration of whether Hawaii might be treated as a domestic rather than as an international point. Furthermore, since the statement was made before WU's divestiture of its international operations, which did not occur until 1963, the Commission apparently assumed that since Hawaii remained an international point any WU service to Hawaii would be subject to the outstanding divestiture order. However, since WU has now complied with the divestiture order, it no longer applies. To the extent that the Commission's statement in Telegraphic Service With Hawaii is offered as an interpretation of § 222 supporting the majority's position here, it has been greatly eroded by the Commission's decisions in later cases, see American Satellite Corp., 43 F.C.C.2d 348, 353 (1973); RCA Global Communications, Inc., 42 F.C.C.2d 774, 780 (1973), and as a practical matter overruled by its decision in the present case. In view of this conflict, whatever weight might otherwise be accorded to the Commission's earlier interpretation of its own statute, see United States v. Storer Broadcasting Co., 351 U.S. 192, 203, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), has been dissipated by its later construction. See United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 858-59 n. 25, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).
 
 
 39
 In short, the Commission's conclusion that it has authority to consider WU's application here is in keeping with the pattern and scheme of the Act, which is to set forth legislative objectives and give broad authority to the FCC, as the depository of expertise in the complex business of communications, to implement those principles and achieve the objectives in the light of changing technology and market developments. See United States v. Southwestern Cable, 392 U.S. 157, 172-73, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). The public interest would not be served by treating § 222(c)(ii) as a straitjacket that would preclude WU's provision of international mailgram service where the grant of a certificate to provide such service to Hawaii would be in the public interest and would not violate the plain language of § 222. I would therefore affirm the Commission's order.
 
 
 
 [1]
 The FCC supported its current reading of § 222(c)(2) through American Satellite Corporation, 43 F.C.C.2d 348, 353-54 (1973) and RCA Global Communications, Inc., 42 F.C.C.2d 774, 780 (1973). In American Satellite, the Commission did cite the "theretofore carried on" language of § 222(c)(2) to explain that the term "record communications by wire or radio" as used in § 222(a)(5) (the definition of "domestic telegraph operations") was intended to embrace those types of services being carried on by WU at the time of the merger. However, the case revolved around whether American Satellite, a new company owned jointly by Fairchild Industries and Western Union International, could receive authorization to lease satellite channels from Telestat Canada for domestic communications facilities. WU opposed the application on the grounds that WUI's 20% ownership of American Satellite constituted a merger between an international carrier (WUI) and a domestic carrier (American Satellite), contrary to § 222(c)(2). This objection did not succeed, because the Commission did not find that American Satellite was a domestic carrier. As an international carrier, American Satellite could compete with WU domestically, because ". . . the legislative intent (of § 222) was not to protect Western Union from competition in the domestic communications market. Rather, it was the intent of Congress to preserve the then existing competition in international communications which might be lessened or extinguished by the creation of the domestic telegraph monopoly authorized by Congress." 43 F.C.C.2d at 355. Such a view of § 222 by the Commission which would continue to keep WU out of international operations is consistent with this court's view of the statute. The thrust of RCA Global, supra, is much the same as in American Satellite, supra
 
 
 [1]
 Section 222 of the Communications Act, 47 U.S.C. § 222, is limited to placing restrictions on consolidations and mergers. It does not restrict expansion by a domestic or international carrier through growth
 
 
 [2]
 Since 1972, WUI, RCA and ITT have applied to the Commission for permission to provide services similar to WU's mailgram service between the continental United States and various international points, including Hawaii