RCA GLOBAL COMMUNICATIONS, INC., Plaintiff,

v.

The WESTERN UNION TELEGRAPH COMPANY, Defendant.

No. 80 Civ. 6387 (MEL).

United States District Court,
S. D. New York.

Sept. 10, 1981.

**1000**

Cahill, Gordon & Reindel, New York City, for plaintiff; H. Richard Schumacher, Stacy J. Haigney, John C. Koutsos, Andrew L. Deutsch, Francis J. De Rosa, Rodger M. Sanders, New York City, of counsel.

Wald, Harkrader & Ross, Washington, D. C., for defendant; Wm. Warfield Ross, Steven K. Yablonski, Mark Schattner, A. Richard Metzger, Jr., Jane Seigler, Ernest Walton, New York City, John D. Appel, Vice President-Gen. Counsel, Upper Saddle River, N. J., Joel Yohalem, Gen. Sol., Milton J. Grossman, Washington, D. C., of counsel.

LASKER, District Judge.

RCA Global Communications, Inc. ("Globcom") sues pursuant to the Communications Act of 1934, 47 U.S.C. §§ 206 and 207, to recover compensatory and exemplary damages on account of Western Union's provision of international telecommunications service in violation of the Communications Act, 47 U.S.C. §§ 203, 222(c)(2) and 222(e). Western Union ("WU") moves to dismiss the complaint on the grounds that it fails to state a claim upon which relief can be granted, that the Federal Communications Commission ("FCC") has exclusive jurisdiction over the claims and that the issues should be referred to the FCC. Alternatively, WU moves for a stay until the completion of pending administrative proceedings.

I.

The history preceding this suit is set forth in detail in the opinion of the Court of Appeals in *ITT World Communications, Inc. v. Federal Communications Commission*, 635 F.2d 32 (2d Cir. 1980). Briefly stated, Globcom and WU are in the business of providing telecommunications service. As a condition to Congress' enactment of § 222 of the Communications Act in 1943, which allowed WU to merge with Postal Telegraph, WU is prohibited from engaging in "international telegraph operations" and is obligated to distribute its outbound overseas traffic among "international telegraph carriers" (now commonly known as "international records carriers" or "IRCs"). 47 U.S.C. §§ 222(e) and 222(c)(2). Globcom is an IRC.

In September, 1979, WU inaugurated a new overseas telecommunications service, utilizing a Mexican and a Canadian carrier to transmit and receive communications between the continental United States and most foreign countries. This service, known as Western Union International Teletype Service ("WUITS") which WU designates as "Low Cost Routing" ("LCR"), allowed WU to bypass the IRCs and to retain control over the outgoing international business it generated. *ITT World Communications v. F.C.C.*, 635 F.2d at 38–39. Shortly thereafter several IRCs, including Globcom, complained to the FCC that WUITS violated the Communications Act because it constituted international telegraph operations in violation of § 222(c)(2), because it breached the obligation to distribute its international traffic among IRCs under § 222(e), and because WU had failed to obtain prior FCC authorization or to file a tariff for the service.

On December 12, 1979, the FCC adopted an order which found that WUITS would not violate the Communications Act so long as WU filed a tariff for the service. The FCC decided that WUITS constituted only "domestic telegraph operations" under § 222(a) and (b) because the Canadian and

Mexican carriers, rather than WU, were performing the actual overseas transmission. The FCC further held that § 222 did not prohibit WU from engaging in international telecommunications *in futuro* provided that authority were granted by the FCC, despite the earlier unmistakeable statements of the Court of Appeals in *Western Union International, Inc. v. Federal Communications Commission*, 544 F.2d 87, 92 (2d Cir. 1976), *cert. denied, Western Union Tel. Co. v. Western Union Intern. Inc.*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977) ("Mailgram"), that § 222 operates "as a continuing bar to Western Union's involvement in international communications" and that "[b]ecause it was Congress that enacted the statute and imposed this ban . . . it is only Congress that, under the circumstances of this case, can change it."

On review of the FCC order, the Court of Appeals rejected the FCC's analysis and held that WU's overseas service violated both the prohibition of § 222(c)(2) on WU engaging in "international telegraph operations" and the obligation under § 222(e) to distribute its overseas bound traffic among IRCs. *ITT World Communications v. F.C.C., supra.* In its strongly worded opinion, the court rebuked the FCC for "the Commission's defiance of *Mailgram*" and stated that WU's "conduct of international telegraph operations . . . clearly violates § 222 of the Act and cannot lawfully be authorized by the FCC . . ." 635 F.2d at 43. In a proceeding shortly thereafter, the Court of Appeals held that WU's offer of WUITS service even after the Court's decision constituted "contemptuous conduct." *ITT World Communications, Inc. v. Federal Communications Commission*, 635 F.2d 43 (1980).

## II.

A. WU first contends that until the Court of Appeals declared that WUITS violated the Communications Act, its international telecommunications service had not been "prohibited or declared unlawful" and therefore was not actionable under § 206 of the Act. According to WU, its international service had been lawful because it had been approved by the FCC and, under the provisions of § 408 of the Communications Act, FCC orders "shall continue in force . . . unless . . . suspended or modified or set aside by the Commission or . . . by a court of competent jurisdiction." 47 U.S.C. § 408. WU argues that a private damage action based on conduct approved by the FCC is inconsistent with the scheme of the Act and would undermine the FCC's exercise of its regulatory authority by burdening compliance with its orders with the threat of a later damage suit.

Globcom answers that the FCC's unauthorized approval of WU's conduct cannot serve to immunize WU from liability. According to Globcom, the statutory language of § 222 and the definitive construction accorded the statute by the Court of Appeals in *Mailgram*, prior to WU's entry into the international telecommunications market, clearly forbade WU's conduct, and thus WU acted at its own risk. Globcom argues further that WUITS was unlawful under the provisions of § 222 itself and its unlawfulness did not depend upon FCC construction of the statute. It is irrelevant to WU's liability, Globcom contends, that it was necessary for the Court of Appeals to render the judgment banning WUITS that the FCC should have rendered in the first instance. In addition, Globcom emphasizes that this is not a case in which liability is premised upon conduct which a private party was ordered to undertake by a government agency, since the FCC did not *order* WU to undertake overseas service but merely construed the Communications Act not to forbid it.

B. WU further contends that equitable principles dictate that the Court of Appeals' decision in *ITT World Communications* not be applied retroactively to impose liability for conduct taken in accordance with an FCC order. Otherwise, it argues, regulated parties will be paralyzed from relying on agency decisions in determining their course of business. Relying heavily on *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (Lemon II), WU claims

that, despite the facts that the FCC order at issue was subject to judicial review and that a challenge to its validity could be expected, its reliance on the order was reasonable.

Globcom replies that the principle of non-retroactivity upon which WU relies is not applicable to this case. First, Globcom contends that its allegations of bad faith on the part of WU prevent the application of equitable principles at this stage of the case, and that in any event good faith is not a defense to a § 222 damage action. Second, Globcom maintains that no issue of reasonable reliance is present because WU did not rely on the FCC's approval in instituting its overseas service but began its service without seeking FCC authorization and before the FCC ruled on the issue. Third, Globcom argues that it has never been held that a party's reliance on a decision of an administrative decision serves to immunize the party from liability in a legal action for damages. Fourth, Globcom contends that WU's analysis of retroactivity cases mistakes the applicability of equitable considerations in cases where a long-standing precedent has been overruled to cases, like the present one, where there has been no overruling but rather a simple reversal of an erroneous agency decision. According to Globcom, WU's position rests on the novel proposition that a defendant is not liable for the continuing damages suffered during the pendency of a successful appeal. Finally, Globcom next asserts that even if the retroactivity cases cited by WU did apply, the criteria delineated by the Supreme Court in *Chevron Oil v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), support application of the Court of Appeals' *ITT World Communications* decision to WU's conduct because that decision neither overruled settled precedent nor was an unforeshadowed case of first impression, it will foster the purposes of § 222 to permit the suit to continue, and no inequitable result will follow.

C. Relying on § 207 of the Act, which provides that an aggrieved party may seek damages for a Communications Act violation either through the FCC or a court, but not in both fora, WU next argues that the FCC has exclusive jurisdiction over Globcom's claims. According to WU, Globcom elected to pursue its administrative remedies by complaining to the FCC and seeking administrative sanctions when WU initiated its international service and by seeking monetary damages for WU's allegedly unlawful diversion of overseas telecommunications traffic in formal complaints filed with the FCC in July, 1980.

Globcom responds that it has never sought damages through the FCC for WU's entry into the international telecommunications market. Instead, it merely wrote letters complaining of WU's actions to the FCC soon after WU inaugurated WUITS and the FCC instituted its own informal inquiry resulting in the FCC order approving the practice. With respect to the administrative complaints filed in July, 1980, Globcom argues that they seek damages for WU's failure to provide interconnection equipment and access to Globcom and do not involve claims for damages from WU's illegal provision of overseas service at issue in the present case.

D. WU claims that the doctrine of primary jurisdiction dictates dismissal or a stay of these proceedings pending administrative resolution. The argument runs that a decision in this action would present a substantial risk of inconsistent or duplicative judgments and that the FCC is the preferable forum because it has the expertise necessary to apportion an award of damages, if any, among the various IRCs who may be entitled to compensation. Furthermore, WU maintains that the issues presented here are already before the FCC and that the FCC is intimately familiar with the questions presented because it has been involved in the controversy since its inception. According to WU the issues raised here are only a part of a broader dispute between it and other domestic and international telecommunications carriers which is presently before the FCC and that only by application of the doctrine of primary jurisdiction can the FCC's comprehensive supervisory authority be exercised consistently for these and related issues.

Globcom retorts that the doctrine of primary jurisdiction should not be applied here because the essential factual and legal issues upon which its claims rest have been definitively resolved by the Court of Appeals decision and the only remaining question is the quantum of damages, a matter which does not concern the FCC's policy-making role or require its expertise. Moreover, Globcom emphasizes that the doctrine of primary jurisdiction need not be applied where the agency has already expressed its hostility to the plaintiff's claim. It adds that there is no proceeding pending before the FCC involving WU's overseas telecommunications service and that in any event judicial resolution of the issue of the quantum of damages for past conduct does not raise a possibility of conflict with the FCC's ongoing administration of the Communications Act.

E. Finally, WU contends that there is no basis for a damage claim in its failure to file a tariff for its overseas service. WU asserts that this was merely a technical violation from which Globcom alleges no injury. Globcom, on the other hand, maintains that the question whether it suffered damage from WU's failure to file a tariff must be resolved by evidence at trial.

### III.

WU's motion to dismiss the complaint or stay these proceedings is denied, except for that part of the motion seeking dismissal of Globcom's claim for damages based on WU's failure to file a tariff for its international service, which is granted unless within thirty days Globcom amends its complaint to allege specific damage it suffered from WU's tariff violation.

■ A. The proposition that WU's international telecommunications service was not "prohibited" for the purposes of § 206 of the Communications Act until the Court of Appeals declared it so is without merit. Section 222 prohibits WU, as a merged carrier, in *haec verba* from engaging in "international telegraph operations," 47 U.S.C. § 222(c)(2), and § 222(e) obligates WU to distribute its outbound overseas traffic

among IRCs. Section 206 specifically provides for the recovery of damages "[i]n case any common carrier shall do any act, matter or thing in this chapter prohibited or declared to be unlawful . . ." 47 U.S.C. § 206. WU's liability therefore depends only on the question whether its overseas service constituted "international telegraph service" within the meaning of § 222(c)(2), or whether it violated its obligation to distribute its overseas traffic among IRCs under § 222(e). As indicated above, the Court of Appeals has definitively held that WU's service constituted both "international telegraph operations" under § 222(c)(2) and a breach of WU's obligations under § 222(e). It follows that, by entering the overseas telecommunications market, WU embarked on a course of conduct "prohibited or declared to be unlawful" by the Communications Act, and it is "liable to the person or persons injured thereby . . ." 47 U.S.C. § 206.

■ We need not determine whether the FCC's approval of WUITS might carry weight if the FCC had been delegated authority to determine which operations would be permissible and which would be prohibited for communications carriers. With respect to merged telecommunications carriers, the FCC never possessed such authority. The Act itself limits merged carriers to the domestic market. In these circumstances, the FCC acted in an adjudicatory rather than a rulemaking role which it construed the Communications Act to permit WUITS. By providing for judicial review, however, Congress intended that the courts, rather than the FCC, should have the final say on the interpretation of the Act.

■ Nor are we persuaded by WU's argument that the FCC order served to immunize it from liability for its overseas service by virtue of § 408 of the Act, which provides that FCC orders "shall continue in force . . . unless . . . suspended or modified or set aside by the Commission or . . . by a court of competent jurisdiction." 47 U.S.C. § 408. Section 408 appears to be directed to

orders which require affirmative action to be taken by a party. The "order" at issue here did not, however, require WU to establish or continue to operate its overseas service. Instead, it merely interpreted the Communications Act not to forbid such operations. There is no question here of WU having been forced, by the authority of the FCC, to "comply" with an FCC order which remained in force until vacated under § 408. Moreover, § 408 does not purport to immunize from future damage actions conduct taken in compliance with an FCC order. Whatever bearing § 408 may have where a party is sued for actions taken in accordance with an affirmative FCC order, this is not such a case. Accordingly, we hold that the unauthorized and erroneous FCC decision that WUITS did not violate the Communications Act does not prevent WU from being held liable for its illegal conduct.

■ We do not agree with WU that such a holding serves to undermine the FCC's regulatory authority. As the Court of Appeals made abundantly clear in both the *Mailgram* and *ITT World Communications* cases, the FCC simply had no authority to authorize WU to engage in international telecommunications operations. Entertaining a private damage action based on conduct which the FCC had no authority to approve does not, therefore, interfere with the agency's legitimate administration of the Communications Act. To the contrary, such a suit serves to ensure that "the Commission's defiance of *Mailgram*" is not granted legal validity.

B. It is true, as WU contends, that the FCC's lack of authority to approve WU's overseas service is not the end of the question whether it may be held liable in damages for its unlawful international service. Still to be considered is the issue whether the Court of Appeals' decision in *ITT World Communications* should be limited to prospective effect. While Globcom argues that there has been no case in which a party has been deprived of a statutory right to damages because its adversary relied upon an erroneous administrative decision, the fact remains that administrative orders, like "statutory and even judge-made rules of law are hard facts on which people must rely in making decisions and shaping their conduct. This fact of legal life underpins our modern decisions recognizing a doctrine of nonretroactivity." *Lemon v. Kurtzman,* 411 U.S. 192, 199, 93 S.Ct. 1463, 1468, 36 L.Ed.2d 151 (1973) (Lemon II). *See also Chevron Oil Company v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); *Atlantic Richfield Company v. Federal Energy Administration,* 463 F.Supp. 1079 (N.D.Cal. 1979) (recognizing justifiable reliance on administrative order as basis for application of doctrine of nonretroactivity). Furthermore, while the court in *Lemon* II emphasized the fact that an equitable decree was at issue there, we do not agree with Globcom that the doctrine of nonretroactivity is necessarily limited to cases involving such a remedy. *See Chevron Oil Company v. Huson,* 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 36 L.Ed.2d 151 and cases cited therein. Nor are we persuaded by Globcom's contention that the doctrine of nonretroactivity is irrelevant because *ITT World Communications* involved a simple reversal rather than an overruling of precedent. Contrary to Globcom's assertions, the doctrine of nonretroactivity does not depend on the existence of nonlitigants who may have relied on the former rule of law. *See, e. g., Lemon v. Kurtzman, supra; Atlantic Richfield Company v. Federal Energy Administration, supra.* Nevertheless, we do agree with Globcom that the doctrine of nonretroactivity should not be applied here.

■ The doctrine of nonretroactivity serves to reconcile the legal interests in a new rule of law with the reliance interests founded upon a preexisting rule of law. The question presented is whether "we should reach back to disturb or to attach legal consequence to patterns of conduct premised either on unlawful statutes or on a different understanding of the controlling judge-made law from the rule that ultimately prevailed." *Lemon v. Kurtzman,* 411 U.S. at 198, 93 S.Ct. at 1468. The Supreme Court has set forth three primary factors to be considered in determining

whether to apply a decision retroactively: 1) whether the decision to be applied retroactively establishes a "new principle of law, either by overruling clear precedent upon which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed"; 2) whether retrospective application will further the purposes of the rule in question; and 3) whether retrospective application will produce "substantial inequitable results." *Chevron Oil Company v. Huson*, 404 U.S. at 106–107, 92 S.Ct. at 355.

■ Applying these criteria to the case at bar, we find no basis for limiting the Court of Appeals decision in *ITT World Communications* to prospective application. First, the decision in *ITT World Communications* did not establish a new rule of law. To the contrary, the Court of Appeals began its opinion by stating that "[o]nce again we are faced with a major question with respect to the provision of international telecommunications service in the United States, which we thought we had firmly settled in ... *Mailgram*." *ITT World Communications v. Federal Communications Commission*, 635 F.2d at 33. Indeed, the court pointed out that the FCC's order was inconsistent not only with the *Mailgram* decision, but also with the FCC's own views expressed in cases arising prior to *Mailgram*. 635 F.2d at 43. In short, the conclusion that WU may not engage in international telecommunications service neither overruled clear past precedent nor presented an issue of first impression.

Second, WU's contention that it was entitled to rely on the FCC approval of WUITS service is unpersuasive. Given the existence of the *Mailgram* decision, the FCC order simply did not constitute the kind of "clear past precedent" envisaged in *Chevron Oil*. To the contrary, the Court of Appeals' reversal was clearly foreshadowed by *Mailgram*, and therefore it cannot be said that any reliance by WU was reasonable or justified. Moreover, WU's assertion of justifiable reliance on the FCC order is directly contradicted by the fact that it unilaterally instituted its overseas telecom-

munications service without first seeking FCC authorization. *ITT World Communications v. Federal Communications Commission*, 635 F.2d at 38. Rather than relying on any rule of law, it would appear that WU began its overseas operation in blatant opposition to the extant law.

Third, the purpose of the statutory provisions vindicated in *ITT World Communications* will be fostered by retrospective application of that decision. As described by the Court of Appeals, the purpose of the statutory ban on WU engaging in overseas telecommunications operations is, at least in part, to prevent WU from using its domestic monopoly over telegraph operations to favor its own overseas system to the detriment of the IRCs. 635 F.2d at 36. By permitting Globcom to recover for whatever injury it may have sustained as a result of WU's illegal entry into the international market, this statutory purpose would be vindicated.

Finally, retrospective application of *ITT World Communications* will produce no substantial inequities. Whatever equities may support WU's position, it is also presumably true that WU profited from its illegal service. Globcom, on the other hand, was entitled by statute to have WU distribute its outbound overseas traffic among the IRCs, and it has allegedly suffered substantial loss of business from WU's failure to do so. In these circumstances, the equities support Globcom's claim for damages and warrant retrospective application of *ITT World Communications*.

■ C. We also find unpersuasive WU's argument that Globcom has elected to pursue administrative remedies and is therefore precluded from presenting its claim here under § 207. While Globcom did invoke the FCC's remedial authority in 1979 with respect to WU's overseas service, WU has failed to demonstrate that Globcom ever presented a claim for damages to the FCC concerning WU's overseas operations. Section 207 clearly relates to a "suit for the recovery of damages," 47 U.S.C. § 207, and grants the aggrieved party the choice of administrative or judicial remedies for

those damage claims. The only evidence presented by WU in support of its position consists of two formal complaints filed with the FCC by Globcom in July, 1980. (W.U. Exs. 3–L, M). However, as we read these complaints, they relate to WU's alleged failure to provide interconnection equipment and access and mention WU's overseas operations only in support of allegations of WU's bad faith, not as a basis for the recovery of damages. Accordingly, we find that Globcom has not presented its claim for damages from the WUITS operation to the FCC, and conclude that the FCC does not have exclusive jurisdiction over the claim under § 207.

■■■ D. We decline to apply the doctrine of primary jurisdiction in this case. The doctrine is intended to accommodate the "complementary roles of courts and administrative agencies, *Far East Conference v. United States*, 342 U.S. 570, 575, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952), by ensuring that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States*, 342 U.S. at 574, 72 S.Ct. at 494. The factors to be considered in determining whether to apply the doctrine are 1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise, 2) whether the question at issue is peculiarly within the agency's discretion, 3) whether there exists a substantial danger of inconsistent rulings, and 4) whether a prior application to the agency has been made. *Orange & Rockland Utilities, Inc. v. Howard Oil Co.*, 416 F.Supp. 460, 466 (S.D.N.Y.1976).

■■■ Applying these factors, there is no basis for deferring to the FCC. All of the significant legal and factual issues have been resolved by the decision in *ITT World Communications* and the only remaining question to be resolved is the apportionment of damages. While the FCC may be more familiar with the particular markets at issue here, the questions at hand do not involve technical or policy considerations and may be safely said to be within the conventional experience of judges. Moreover, the determination of the proper measure of damages does not involve the FCC's discretion, but rather is the kind of matter classically decided by courts. And since there is no pending dispute before the FCC involving the same claim, there is no danger of inconsistent rulings. Finally, while the dispute originated with the FCC, where the agency "has already evinced its 'special competence' in a manner hostile to petitioner, courts need not bow to the primary jurisdiction of the administrative body." *Board of Education v. Harris*, 622 F.2d 599, 607 (2d Cir. 1979), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). WU's argument that the doctrine of primary jurisdiction should be applied because this dispute is part of a broader contest between WU and other domestic and international telecommunications carriers is unpersuasive in the circumstances. Here the question presented does not affect the regulatory system of telecommunications in general, but only a particular claim for damages from a course of conduct that has already been judicially determined to be illegal.

■■■ E. We agree with WU that Globcom's claim based on WU's failure to file a tariff for its overseas service is insufficient. Sections 206 and 207 of the Act by their terms provide a private cause of action for a party *damaged* by another's violation of the Act. Globcom has failed to allege any damage flowing from the lack of a tariff or to articulate any possible damages which it may be able to prove at trial. In all candor, we find it difficult to conceive of any damages Globcom could have suffered as a result of the tariff violation not identical to the damages resulting from the violations of the Communications Act. Globcom acknowledges as much. (Br. at 63). In these circumstances, the claim will be dismissed unless Globcom amends its complaint within thirty days to allege specific damages resulting from WU's tariff violation itself.

\* \* \*

WU's motion to dismiss the complaint or stay these proceedings is denied, except for that portion of the complaint based on WU's failure to file a tariff for its overseas telecommunications service, which will be dismissed thirty days from the filing of this Memorandum unless Globcom amends its complaint in good faith to allege damages resulting from WU's tariff violation itself.

It is so ordered.