217 F.2d 579
 The WESTERN UNION TELEGRAPH COMPANY, Globe Wireless, Ltd., and Tropical Radio Telegraph Company, Petitioners,
v.
UNITED STATES of America, Respondent, Federal Communications Commission, American Cable & Radio Corporation, All America Cables and Radio, Inc., The Commercial Cable Company, Mackay Radio and Telegraph Company, Inc., Commercial Pacific Cable Company, and RCA Communications, Inc., Intervenors.
 No. 41.
 Docket 23059.
 United States Court of Appeals, Second Circuit.
 Argued November 9, 1954.
 Decided December 8, 1954.
 
 George D. Rives, San Francisco, Cal. (John H. Waters, William Wendt, William E. Seward, New York City, for petitioner The Western Union Telegraph Co., Brobeck, Phleger & Harrison, San Francisco, Cal., for petitioner Globe Wireless Ltd., and John J. Ryan, Jr., Boston, Mass., for petitioner Tropical Radio Telegraph Co.), for petitioners.
 Richard A. Solomon, Washington, D. C. (Stanley N. Barnes, Asst. Atty. Gen., and Daniel M. Friedman, Sp. Asst. to Atty. Gen., Washington, D. C., for United States of America, respondent; Warren E. Baker, Gen. Counsel, Washington, D. C., J. Smith Henley, Asst. Gen. Counsel, Harrison, Ark., and Stanley S. Neustadt, Counsel, Federal Communications Commission, Washington, D. C., for intervenor Federal Communications Commission), for the United States of America.
 James A. Kennedy, New York City (John F. Gibbons, New York City, on the brief), for intervenors American Cable & Radio Corp., All America Cables and Radio, Inc., The Commercial Cable Co., Mackay Radio and Telegraph Co., Inc., and Commercial Pacific Cable Co.
 Howard R. Hawkins, New York City (James E. Greeley and Leonard W. Tuft, New York City, on the brief), for intervenor RCA Communications, Inc.
 Before CLARK, Chief Judge, and FRANK and HARLAN, Circuit Judges.
 CLARK, Chief Judge.
 
 
 1
 This petition for review concerns the legality under 47 U.S.C. § 222 of certain contracts entered into in 1949 between Western Union Telegraph Company on the one hand and Globe Wireless Ltd. and Tropical Radio Telegraph Company on the other. Under these contracts Western Union agrees to and does assign to the respective companies all telegraph messages to certain geographical areas specifically routed by the sender via Western Union Cables. Western Union receives as a fee for these services a compensation in excess of that normally charged for landline services. These fees, originally a flat sum per period, and now a fixed sum per word, are not related to the cost encountered by Western Union in performing these contractual obligations. The geographical areas encompassed by these agreements, the Pacific and Central America areas, are those which Western Union has not itself serviced at any time, since it has no facilities to render such service.
 
 
 2
 The jurisdiction of the Federal Communications Commission over these contracts stems from that Commission's approval in 1943 of the merger of Western Union and Postal Telegraph, Inc., pursuant to 47 U.S.C. § 222. 10 F.C.C. 148. In connection with this merger the Commission undertook the statutory responsibility of insuring that the ensuing domestic telegraph monopoly would not discriminate between international telegraph carriers. 47 U.S.C. § 222(e). It approved a Formula for the Distribution of Outbound International Traffic,[1] proposed by the carriers themselves, for equitable allocation of all international telegraph traffic emanating from the continental United States. 10 F.C.C. 184. Under this, quotas were allotted to interested carriers by geographical areas, in accordance with their activities and facilities in the base year 1942. Quota fulfillment was to be computed by addition of routed to unrouted messages handled by the carrier, in order to reduce the incentive to get specific routings, which were, however, to be respected. Periodic instructions from the International Quota Bureau to Western Union informed it of the necessary allocations of unrouted traffic to achieve the contemplated equalization. In addition, the Formula explicitly permitted two companies, Press Wireless, Inc., and RCA Communications, Inc., to receive all messages specifically routed to them in certain areas without quota.
 
 
 3
 Despite the fact that Western Union has no quotas and is not listed as entitled to messages without quota in the areas involved in the disputed contracts, petitioners claim that these contracts are valid under a clause in the Formula which provides: "Anything in this formula to the contrary notwithstanding, the Merged Company and each international carrier shall respect specific routings of any messages handled by it, and shall transfer to another carrier any messages specifically routed via such other carrier." Petitioners read this provision to override all contrary allocations elsewhere in the Formula; the intervening carriers disagree, and so did the Commission.
 
 
 4
 The Commission's interpretation of a Formula adopted and approved by it after careful consideration — like other administrative regulations of a responsible governmental agency — is entitled to great weight if not so unnatural or unreasonable as to ensnare and entrap those governed by it. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700; Danielson v. Civil Aeronautics Board, 2 Cir., 204 F.2d 266; Crowley's Milk Co. v. Brannan, 2 Cir., 198 F.2d 861; Fleet-Wing Corp. v. Clark, Em.App., 166 F.2d 145. The Commission did not err in construing the Formula in the light of the statutory provision which was its authorization. All that was said in Tobin v. Edward S. Wagner Co., 2 Cir., 187 F.2d 977, on which petitioners so heavily rely, is that general statutory principles cannot be relied on to fill a gap in administrative regulations. We did not purport to lay down a general rule preventing administrators from interpreting their regulations to harmonize with the goals of statutory policy.
 
 
 5
 In this case we find the Commission's interpretation not only reasonable, but also persuasive on the merits. A Formula like the one before us clearly must be read as an integrated whole. There are several persuasive reasons for refusing to accept petitioners' reading of the clause upon which they focus. Any clause in the nature of a proviso is always strictly construed. Shilkret v. Musicraft Records, 2 Cir., 131 F.2d 929, certiorari denied Musicraft Records v. Shilkret, 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699. And petitioners' interpretation renders superfluous the explicit permission in later sections of the Formula to RCA Communications and Press Wireless to handle their expressly routed traffic without quotas. Petitioners argue that the opportunities given to these two companies were meant to be left open for all other comers into new areas where they were not interested in 1942. It is ridiculous to suppose that the Formula contemplated strict surveillance of contemporary competition without also intending to limit the dangers of Western Union Cables expansion in the future. The provision for equalization of traffic through corrective distribution of unrouted messages was the heart of the Formula and its application would be seriously undercut by acceptance of petitioners' tactics as legitimate. Furthermore, petitioners' position cannot really be justified as a proper sacrifice to the wishes of the customer. Often a sender chooses cable service as a means of insuring greater secrecy for his message; but under the contracts here, this wish is not respected, for while Western Union offers a cable service, Globe and Tropical do not.
 
 
 6
 Petitioners urge that their reading of the Formula must be correct because it has been advocated in the past by several of the carriers here involved as intervenors. Even if true, such past actions would be no more persuasive than Western Union's own position to the contrary in the years preceding these contracts, when Western Union considered such messages as unrouted. But actually the companies involved claimed their own routed messages only to areas in which they were, in terms of the Formula, "interested." Moreover, one of the intervenors, Commercial Pacific Cable Company, has consistently repudiated petitioners' interpretation.
 
 
 7
 Petitioners further claim that the Commission erroneously failed to distinguish between its landlines and its overseas divisions. They contend that the contracts here in question were entered into solely by the Western Union Cables and were thus not governed by either the Formula or 47 U.S.C. § 222(e) regulating the activities of the merged landlines carrier. This argument is ingenious, but unpersuasive. Subsection (4) of 47 U.S.C. § 222(e), on which petitioners rely, unless limited as the Commission suggests to the allocation of quotas, would permit Western Union effectively to escape all of the contemplated regulation. In all operating realities, Western Union Telegraph Company encompasses the activities of Western Union Cables, which in legal effect is but the name given to Western Union's international operations. The international and the domestic components of the company file one consolidated tariff with the Commission. Profits from the contracts in question were considered revenue to the company as a whole. In the absence of a demonstration by Western Union of any managerial or accounting division of its two components, the international and the domestic, the Commission could reasonably attribute the illegal contracts to the organization as a whole.
 
 
 8
 Apart from the illegality of these agreements under the Formula, the Commission also suggested that the exorbitant contract prices might in themselves violate 47 U.S.C. § 222(e). The fees paid Western Union under these arrangements are vastly in excess of the charges assessed by other carriers for the performance of similar services. We agree also with this conclusion of the Commission; these fees, the result of mere horse-trading, as petitioners' witnesses conceded, were neither just nor reasonable nor in accord with the uniform standard of the Commission.
 
 
 9
 The orders of the Commission are therefore affirmed.
 
 
 
 Notes:
 
 
 [1]
 The nature of the Formula is aptly described by its full title, viz., "Formula, Pursuant to Section 222(e) (1) of the Communications Act, for the Distribution of Outbound International Traffic Handled by The Western Union Telegraph Company following Merger with Postal Telegraph, Inc."
 This is repeated in more detail in an introduction, while other salient portions provide:
 "I. Traffic for which distribution is provided herein
 "The traffic for which distribution is provided herein is all telegraph traffic by wire or radio, routed and unrouted, handled by the Merged Company originating in the continental United States and destined to points outside the continental United States, Canada and Mexico * * *.
 "The geographical areas of destination of the traffic covered by this formula are the following: [Here follow listing of three main areas, "A" or Atlantic, "B" Latin America, and "C" Pacific. Each of these contain sub-areas; Central America is so included under "B."]
 [II. lists all the "Interested international carriers" according to areas.]
 "III. Categories and specific routings
 "Each classification of traffic destined to each of the geographical sub-areas specified above shall for the purposes of this formula constitute a separate `category' or `category of traffic,' and quotas for each such category shall be established as hereinafter provided.
 "Anything in this formula to the contrary notwithstanding, the Merged Company and each international carrier shall respect specific routings of any messages handled by it, and shall transfer to another carrier any messages specifically routed via such other carrier. * * *
 [IV. provides for "Quotas" according to the standard stated in the text based upon traffic in the year 1942.]
 "V. Distribution of traffic in accordance with quotas
 "The quotas established pursuant to sections IV and VI hereof with respect to each category shall be applied by the Merged Company as follows: all the outbound traffic (routed and unrouted) in such category, handled by the Merged Company, except
 "(a) the traffic in such category distributed to an international carrier not entitled to a quota in such category but entitled to receive traffic in such category specifically routed via it, * * * shall be distributed among the international carriers entitled to quotas in such category * * *.
 "X. Equality of treatment of international carriers and division of charges
 "The services furnished by the Merged Company to the international carriers in connection with the handling of international traffic covered by this formula shall be uniform and non-discriminatory * * *."
 Other provisions of the lengthy document deal with matters of administration and supervision of the operation of the Formula and are not here pertinent.