**ITT WORLD COMMUNICATIONS INC.**
**and RCA Global Communications, Inc.,**
**Western Union International, Inc., Petitioners,**

v.

**The FEDERAL COMMUNICATIONS**
**COMMISSION and United States of**
**America, Respondents,**

and

**TRT Telecommunications Corporation**
**and The Western Union Telegraph**
**Company, Intervenors.**

**Nos. 864, 865 and 1279, Dockets 79–4220,**
**80–4003 and 80–4016.**

United States Court of Appeals,
Second Circuit.

Argued June 11, 1980.

Decided Aug. 25, 1980.

Grant S. Lewis, New York City (John S. Kinzey, Jr., Karen Hutson, Diane K. Newman, LeBoeuf, Lamb, Leiby & MacRae, Joseph J. Jacobs, Theodore J. Fischkin, Susan I. Littman, New York City, of counsel), for petitioner ITT World Communications Inc.

H. Richard Schumacher, New York City (P. Kevin Castel, John C. Koutsos, Daniel A. Fried, Cahill, Gordon & Reindel, Francis J. DeRosa, Rodger M. Sanders, RCA Global Communications, Inc., New York City, of counsel), for petitioner RCA Global Communications, Inc.

John E. Ingle, Asst. Gen. Counsel, F. C. C., Washington, D. C. (Robert R. Bruce, Gen. Counsel, David J. Saylor, Deputy Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., of counsel), for respondent F. C. C.

Joel Yohalem, Washington, D. C. (H. Richard Juhnke, Washington, D. C., R. C. Hostetler, Upper Saddle River, N. J., of counsel), for intervenor The Western Union Tel. Co.

Robert E. Conn, New York City, for petitioner Western Union Intern., Inc.

E. Edward Bruce, Washington, D. C. (William P. Mayer, Covington & Burling, Roderick A. Mette, Vice President and Counsel, Washington, D. C., of counsel), for intervenor TRT Telecommunications Corp.

Before LUMBARD and MANSFIELD, Circuit Judges.[*]

MANSFIELD, Circuit Judge:

Once again we are faced with a major question with respect to the provision of international telecommunications service in the United States, which we thought we had firmly settled in *Western Union International, Inc. v. FCC*, 544 F.2d 87 (2d Cir. 1976), *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977) (*"Mailgram"* herein). Three "international telegraph carriers"[1] (as defined in § 222(a)(3) of the Communications Act of 1934 (the Act), 47 U.S.C. §§ 151 -609)-ITT World Communications, Inc. (ITT), RCA Global Communications, Inc. (RCA) -Western Union International, Inc. (WUI) seek review of an order adopted by the Federal Communications Commission (FCC) on December 12, 1979, and released on January 3, 1980,[2] allowing

---

[*] Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Lumbard and Mansfield, who are in agreement on this opinion. Judge Mehrtens, District Judge for the Southern District of Florida who was designated to sit on this case and who heard the argument, unfortunately died on July 16, 1980. Although he concurred in the disposition of this case, prior to his death he did not have the opportunity to see this opinion.

1. Section 222(a)(3) of the Act defines an "international telegraph carrier" as follows:

"(3) The term 'international telegraph carrier' means any common carrier by wire or radio, the major portion of whose traffic and revenues is derived from international telegraph operations; and such term includes a corporation owning or controlling any such common carrier."

Section 222(a)(6) defines "international telegraph operations" as follows:

"(6) The term 'international telegraph operations' includes acceptance, transmission, reception, and delivery of record communications by wire or radio which either originate or terminate at points outside the continental United States, Alaska, Canada, Saint Pierre–Miquelon, Mexico, and Newfoundland, but does not include acceptance, transmission, reception, and delivery performed within the continental United States between points of origin within and points of exit from, and between points of entry into, and points of destination within, the continental United States with respect to such communications, or the transmission within the continental United States of messages which both originate and terminate outside but transmit through the continental United States."

2. By decision dated May 7, 1980, *ITT World Communications Inc. v. Federal Communications Commission and United States of America*, 621 F.2d 1201 (2nd Cir.), we denied motion of respondents FCC and the United States to dismiss the petition for review or to transfer

Western Union Telegraph Company (WU),[3] a "domestic telegraph carrier" (as defined in § 222(a)(2)[4]) to offer a new overseas service under the style of "Western Union International Teletype Service" (WUITS). For this operation WU uses the services of a Canadian carrier, CNCP Telecommunications (CNCP) and a Mexican carrier, Direccion General de Telecommunicaciones (Telecomex), to transmit and receive communications between the continental United States and most foreign countries of the world.

The FCC rejected the international carriers' contention that the new WU service violated provisions of § 222 of the Act which preclude WU, a merged carrier, from engaging in "international telegraph operations" and obligate it to distribute among international telegraph carriers communications destined to overseas points outside the continental United States.[5] Petitioners'

---

the petition to the District of Columbia Circuit, holding that the Commission's adoption of its order on December 12, 1979, was sufficiently final to serve as a basis for judicial review under 28 U.S.C. § 2344 and for invocation of the provisions of 28 U.S.C. § 2112(a).

3. In addition WU and TRT Telecommunications Corporation (TRT), have been permitted to intervene.

4. Section 222(a)(2) of the Act defines a "domestic telegraph carrier" as follows:

"(2) The term 'domestic telegraph carrier' means any common carrier by wire or radio, the major portion of whose traffic and revenues is derived from domestic telegraph operations; and such term includes a corporation owning or controlling any such common carrier."

Section 222(a)(5) defines "domestic telegraph operations" as follows:

"(5) The term 'domestic telegraph operations' includes acceptance, transmission, reception, and delivery of record communications by wire or radio which either originate or terminate at points within the continental United States, Alaska, Canada, Saint Pierre Miquelon, Mexico, or Newfoundland and terminate or originate at points within the continental United States, Alaska, Canada, Saint Pierre–Miquelon, Mexico, or Newfoundland, and includes acceptance, transmission, reception, or delivery performed within the continental United States between points of origin within and points of exit from, and between points of entry into and points of destination within, the continental United States with respect to record communications by wire or radio which either originate or terminate outside the continental United States, Alaska, Canada, Saint Pierre–Miquelon, Mexico, and Newfoundland, and also includes the transmission within the continental United States of messages which both originate and terminate outside but transit through the continental United States: *Provided*, That nothing in this section shall prevent international telegraph carriers from accepting and delivering international telegraph messages in the cities which constitute gateways approved by the Commission as points of entrance into or exit from the continental United States, under regulations prescribed by the Commission, and the incidental transmission or reception of the same over its own or leased lines or circuits within the continental United States."

5. Section 222(c)(2) of the Act provides:

"(2) Any proposed consolidation or merger of domestic telegraph carriers shall provide for the divestment of the international telegraph operations theretofore carried on by any party to the consolidation or merger, within a reasonable time to be fixed by the Commission, after the consideration for the property to be divested is found by the Commission to be commensurate with its value, and as soon as the legal obligations, if any, of the carrier to be so divested will permit. The Commission shall require at the time of the approval of such consolidation or merger that any such party exercise due diligence in bringing about such divestment as promptly as it reasonably can."

Section 222(e)(1) provides:

"(e)(1) In the case of any consolidation or merger of telegraph carriers pursuant to this section, the consolidated or merged carrier shall, except as provided in paragraph (2) of this subsection, distribute among the international telegraph carriers, telegraph traffic by wire or radio destined to points without the continental United States, and divide the charges for such traffic, in accordance with such just, reasonable, and equitable formula in the public interest as the interested carriers shall agree upon and the Commission shall approve: *Provided, however,* That in case the interested carriers shall fail to agree upon a formula which the Commission approves as above provided, the Commission, after due notice and hearing, shall prescribe in its order approving and authorizing the proposed consolidation or merger a formula which it finds will be just, reasonable, equitable, and in the public interest, will be, so far as is consistent with the public interest, in accordance with the existing contractual rights of the carriers, and will effectuate the purposes of this subsection."

contentions that WU was providing a new service without authorization required by § 214 of the Act, 47 U.S.C. § 214,[6] and had violated § 203 of the Act, 47 U.S.C. § 203, by providing a service for which no tariff had been filed with the FCC, were also rejected except that the Commission order requires WU to file a tariff under the Act but permits it to continue to provide the new service pending a determination of the tariff's lawfulness.

The principal issue raised by this petition is whether WU may offer the new overseas service under the Act. The FCC held that WU's role in the WUITS service consists of "domestic telegraph operations" as defined in § 222(a)(5) of the Act, which WU is authorized to provide. It further decided in the alternative that if the service amounts to "international telegraph operations" within the meaning of the Act WU may, notwithstanding our contrary decision in *Western Union International, Inc. v. FCC*, 544 F.2d 87 (2d Cir. 1976), *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977), be authorized by the FCC to engage in such activities. We hold that WU's new overseas service violates the Act since it constitutes both "international telegraph operations," which § 222(c)(2) of the Act prohibits WU from pursuing, and the handling of overseas traffic which § 222(e)(1) of the Act obligates WU to distribute among "international telegraph carriers" as defined in the Act rather than among "foreign telegraph carriers" such as CNCP and Telecomex. Accordingly, we set aside the Commission's order and direct the Commission immediately to order WU to cease offering or continuing to provide WUITS service or to conduct any international telegraphic operations.

In order to understand the full nature of the problems of statutory construction raised by the petition and to determine the meaning and applicability of the pertinent sections of the Act, an outline of the origin and history of § 222 is essential. Common carriers of telegraphic and radio communications are as public utilities limited in their operations by the terms of the Act and by regulations which the FCC is obligated to promulgate thereunder. *American Tel. & Tel. Co. v. FCC*, 572 F.2d 17, 25 (2d Cir.), *cert. denied*, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978). Regulation by the FCC takes the form principally of exercising the power to grant or withhold certification of new lines in the interest of controlling a carrier's investment, 47 U.S.C. § 214(a), and of reviewing a carrier's rates, services and practices, which may be disapproved, 47 U.S.C. §§ 201 205.

Prior to Congress' enactment of § 222 of the Act in 1943, WU, which was formed in 1844, was the dominant entity in common carriage of telecommunications, i. e., non-voice record messages, within the United States and between the United States and other parts of the world. It controlled a vast network of cables, offices, lines and agencies through which it transmitted messages domestically and to many parts of the world. Its principal domestic competitor was Postal Telegraph. In addition, ITT's predecessors laid and operated cable lines to other parts of the world, establishing "gateways" in principal coastal cities through which they transmitted and received overseas non-voice messages that originated or terminated on the extensive domestic lines that had been created by Postal Telegraph and WU. See *Western Union Divestment*, 30 F.C.C. 323, 325, 346 (1961); *Press Wireless, Inc.*, 21 F.C.C. 511, 513, 517 (1956).

The principal offering of the domestic and international carriers has been "Telex," a teleprinter exchange circuit service under which a message may be sent from a teletypewriter at an originating point to a tele-

---

**6.** Section 214 of the Act provides in pertinent part:

"SEC. 214. (a) No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line: ....."

typewriter at the destination. In addition, beginning in 1930 the American Telephone & Telegraph Company (AT&T) initiated "TWX," a teletypewriter exchange service functionally similar to Telex, which permits a subscriber to dial another subscriber on the public message telephone system within the United States in much the same fashion as telephone subscribers dial stations or numbers they wish to call, and exchange teleprinter traffic. See *Western Union Telegraph Co.*, 49 F.C.C.2d 532, 534 ·36 (1974), for a more complete description of Telex and TWX. Telex and TWX subscribers can reach stations on Canadian and Mexican networks through WU's connection of its facilities with theirs. See *Western Union Telegraph Co.*, 27 F.C.C.2d 515, 516 (1971).

During the Depression in the 1930's both WU and Postal Telegraph suffered a serious decline in business, threatening termination of the latter's operations, which led to a proposal for the merger of the two. Based on a study made by the Senate Committee on Interstate Commerce in late 1941, S.Rep.No.769, 77th Cong., 1st Sess. (1941), legislation was introduced into Congress, S. 2445, for the addition of a § 222 to the Act, which would have required each of the participating domestic carriers to divest itself of its overseas operations and then allow for separate mergers of their domestic and overseas operations. After extensive hearings the Committee drafted a new bill, S. 2598, which was to become S. 158 in the 1943 session of Congress, authorizing a domestic merger provided the merged carrier divested itself of overseas operations and facilities and instead distributed its outbound overseas traffic essentially among

the "international telegraph carriers," such as ITT, RCA, and WUI, now popularly known as the "international records carriers" or "IRCs." S.Rep.No. 13, 78th Cong., 1st Sess. (1943). While recognizing that a merger was advisable to prevent a collapse of domestic service, Congress also realized that WU, as the surviving merged enterprise, would dominate domestic traffic and could, if permitted to retain its overseas operations and network, favor its own system to the detriment of the IRCs, who transmitted overseas messages only to and from five "gateway" cities (New York, San Francisco, Miami, Washington and New Orleans), see *International Record Carriers' Scope of Operations*, 54 F.C.C.2d 909 (1975), and 58 F.C.C.2d 250, 251 n.1 (1976), and who depended on WU and Postal Telegraph for completion of the domestic landline service within the United States. See *Mailgram, supra*, 544 F.2d at 89; *Telegraph Service with Hawaii*, 28 F.C.C. 599, 602, affd. on reconsideration, 29 F.C.C. 714 (1960); *Western Union Telegraph Co.*, 25 F.C.C. 35, 74 (1958); S.Rep.No. 769, 77th Cong., 1st Sess. 20 (1941); Hearings on S. 2445 Before a Subcommittee of the Senate Committee on Interstate Commerce (Consolidations and Mergers of Telegraph Operations), 77th Cong., 2d Sess. at 253, 258 (1942); Hearings Pursuant to S. 2598 Before a Subcommittee of the House Committee on Interstate & Foreign Commerce (Consolidations and Mergers of Telegraph Operations), 77th Cong., 2d Sess. at 16, 180 (1942); S.Rep.No. 1490, 77th Cong., 2d Sess. 9 (1942); S.Rep.No. 13, 78th Cong., 1st Sess. 8 (1943); Statement of Sen. McFarland of Arizona before Senate on February 18, 1943, 89 Cong.Rec. 1092 (1943).[7]

---

7. In *Telegraph Service with Hawaii*, 28 F.C.C. 599, affd. on reconsideration, 29 F.C.C. 714 (1960), the Commission observed:

"At the time such legislation [§ 222] was being considered, Congress was concerned, among other things, that after such merger, with the resultant disappearance of Postal Telegraph competition for the mainland handling of the oversea telegraph traffic of these other carriers, Western Union would be able to favor either its own cable system or a particular oversea carrier, to the detriment of others, with respect to pickup and delivery at

mainland points not served by the limited facilities of such carriers.

"To prevent this, Congress determined that Western Union should divest itself of its oversea telegraph operations (that is, in which it competed with these carriers), and further determined that Western Union should distribute equitably among these oversea carriers such traffic as was filed with it for delivery at points they served outside the U.S. mainland." (28 F.C.C. at 602).

The 1941 Senate Telegraph Study forming the basis of § 222 stated:

Against this background Congress in 1943 enacted § 222 of the Act, 57 Stat. 5, 47 U.S.C. § 222, authorizing a merger of domestic carriers, provided they would divest themselves of their international operations and properties, § 222(c)(2), and requiring the merged enterprise to distribute overseas traffic among the IRCs according to a "just, reasonable and equitable formula," § 222(e)(1). The FCC was authorized to approve a merger and to prescribe a formula that met the conditions of the Act. Pursuant to this authority, the FCC promptly approved the WU–Postal Telegraph merger, *Application for Merger*, 10 F.C.C. 148 (1943), and formulas, *Separate Report on Formulas*, 10 F.C.C. 184 (1943). In *Mailgram, supra*, 544 F.2d at 93, we interpreted § 222(c)(2) as "a continuing bar to WU's involvement in international record communications," which only Congress, not the FCC, could change.

Section 222 divides the world for telegraph and radio communications business purposes into (1) a "domestic" zone embracing the *continental* United States, Canada, Alaska, Saint Pierre–Miquelon, Mexico and Newfoundland, and (2) an "international" or overseas zone consisting of all other parts of the world. "Domestic telegraph operations" are defined to include the handling of communications (Telex and TWX) which originate *and* terminate within the domestic zone, § 222(a)(5). "International telegraph operations," on the other hand, are defined to include the handling of overseas traffic to or from places not in the domestic zone but which may originate or terminate at cities within the continental United States designated as "gateways approved by the Commission as points of entrance into or exit from the continental United States, *under regulations prescribed* by the Commission," § 222(a)(5), (6). Thus WU as a "domestic telegraph carrier" may handle traffic within the domestic zone and the "landline haul" segment within the continental United States of overseas traffic up to or from a point of exit or approved "gateway" city. The transmission to or from an overseas point is an "international telegraph operation" handled exclusively by an IRC. An "international telegraph carrier" or IRC is "any common carrier by wire or radio, the major portion of whose traffic and revenues is derived from international telegraph operations," § 222(a)(3).

Implementation of the plan for WU's divestiture of its international operations took many years, with the FCC periodically extending the time further at WU's request, resulting in litigation to force WU to divest, *Western Union Tel. Co. v. United States*, 267 F.2d 715, 723 (2d Cir. 1959).[8]

"In view of the fact that this company [Western Union] also is a major overseas cable operator, under such an eventuality its control over pick–up and delivery facilities within the United States would seriously impair the operation of its competing international carriers." S.Rep.No. 769, 77th Cong., 1st Sess. 20 (1941).
Chairman Fly of the FCC stated at House hearings to consider § 222:
"[W]e do not want the domestic company to have any international arrangements, that is, any international properties or operations. There are so many difficulties there that we do not think it is wise to have such a tie - in.... I think that they ought to be severed from any international operations and leave those operations to entire separate and independent companies." (House Hearings at p. 16).
This position was later emphasized by Commissioner Durr:
"I think that there is no substantial disagreement anywhere on the proposition that

the domestic combination should get out of the international business.
"On the merits, it is clear that this is an essential requirement. Not only do the economic and practical factors indicate the advisability of a clean separation between the domestic and international sides of the communications field but the problem of distributing traffic to the international carriers by the domestic monopoly is infinitely more complicated so long as that domestic monopoly competes for international business with an ununified international industry. For, added to all the other complications of traffic distribution, which I have already discussed, is the factor of self–interest which might influence the domestic monopoly to prefer its own international department over its competitors in the international field." (House Hearings at 180).

**8.** In *Western Union Tel. Co. v. United States*, 267 F.2d 715, 723 (2d Cir. 1959), we noted that in requiring the WU divestiture of its interna-

Finally in 1963, after FCC approval, *Western Union Divestment*, 30 F.C.C. 323 (1961), WU's international operations were sold to WUI, an independent IRC. In the meantime WU was permitted in 1951 to abandon its "conventional" telegraph service, due to competition from an affiliate of AT&T and other smaller carriers, FCC Annual Report for FY 1951 at 55; FCC, Annual Report for FY 1950 at 43 (1950). In 1959 the FCC denied WU's application for permission to provide Telex and other services between the United States and Hawaii, which was not embraced within the term "domestic telegraph operations," § 222(a)(5), on the ground that the FCC was powerless under § 222 to grant such authority to engage in an "international telegraphic operation . . . no matter how urgent the public interest" and that "[T]he remedy is to ask Congress to amend section 222, not for us to misinterpret it," *Telegraph Service with Hawaii*, 28 F.C.C. 599, 605,[9] *affd. on reconsideration*, 29 F.C.C. 714 (1960). In 1970 WU was permitted, pursuant to § 222, to acquire from AT&T its domestic TWX service, *Western Union Tel. Co. (TWX Acquisition)*, 24 F.C. C.2d 664, 667–68 (1970), thus solidifying WU's control over domestic Telex traffic.

In September 1979 WU, without filing an application with the FCC for certification pursuant to § 214 of the Act, unilaterally inaugurated a new overseas service. Under contract with CNCP and Telecomex, WU solicits and accepts from its approximately 125,000 subscribers in the continental United States overseas Telex business to be routed via CNCP or Telecomex to every country in the world. The initial advertisement to its customers stated in pertinent part:

"URGENT

"A SPECIAL ANNOUNCEMENT BY WESTERN UNION TELEGRAPH CO. WESTERN UNION HAS GONE INTERNATIONAL. . . . WE NOW HAVE SERVICE TO EVERY COUNTRY IN THE WORLD. JUST THINK ONE COMPANY, ONE BILL. WE HAVE MADE OUR SERVICE EASY TO USE, EASY TO TRACK AND WE HAVE SOME ADVANTAGES OVER THE OTHER CARRIERS, BUT MOST OF ALL WE HAVE MADE IT LESS EXPENSIVE. INFORMATION TO FOLLOW. . . .

\*   \*   \*   \*   \*   \*

"OUR SERVICE IS AVAILABLE TO ALL COUNTRYS [sic] NOW. . . .

". . . WE ARE BYPASSING ALL INTL CARRIERS . . ."

The new service, known as Western Union International Teletype Service (WUITS) and called Low Cost Routing (LCR), was offered at a lower price than overseas service through the IRCs. The lower price made it more attractive to customers than dealing with the IRCs.[10] The service was entirely controlled by WU, not by the Canadian or Mexican participants.

Under the traditional overseas call system, the person who sent a telex or TWX

---

tional operations Congress showed a "desire to divorce completely Western Union's virtual landline monopoly, following the merger, from all financial interest in international telegraph operations . . . ."

9. The pertinent text of the Commission's opinion in *Telegraph Service with Hawaii* reads as follows:

"Western Union is suggesting that we exercise a power we do not have, namely, to authorize Western Union service with Hawaii as a domestic telegraph operation. . . . [T]he Western Union argument is equally applicable to Puerto Rico, the Virgin Islands, and all other U.S. possessions, as well as to all oversea foreign points. Since service to any of these points is undoubtedly an international

telegraph operation, we cannot order or permit Western Union to provide such service, no matter how urgent the public interest. . . . [T]he remedy is to ask Congress to amend section 222, not for us to misinterpret it." (28 F.C.C. at 605).

10. WU's advertisements offer its subscribers savings "up to 30%" over rates charged by the IRCs for comparable service. The IRCs contend that this results in reduction of charges to WUITS' customers below rates charged the same customers for Telex messages to points in Canada or Mexico and below rates charged by CNCP and Telecomex to their own customers for international service.

message from the continental United States via an IRC was a customer of the IRC, not WU. The IRCs would advertise and solicit customers, route their messages from the gateway city or point of exit from the continental United States to the overseas destination, handling all customers' inquiries and complaints and bill the customer for all services, including the landline domestic haul part of the service, which was performed by WU as a passive intermediary. WU was compensated by the IRCs for the use of its domestic facilities to complete overseas calls originating from or terminating at points within the continental United States.

Under the WUITS system this control is reversed. WU performs all of these services, including billing of customers for the overseas calls, advertising, handling of inquiries and advising customers as to rates.[11] The WU subscriber uses an access code to dial WU's computerized switching system ("Info–Master"), not a code for CNCP or Telecomex, thus ceding control over the overseas transmittal to WU. Neither CNCP nor Telecomex have any direct contact with the customers. Their names are not mentioned in any WU advertisements of the service. They are reimbursed by WU for the use of their facilities. The service is essentially a WU overseas service in which these two connecting carriers remain virtually anonymous as far as the public is concerned. As further evidence of WU's control, it advises its customers that when it cannot establish a circuit to a foreign country through these facilities it will route their messages via TRT Telecommunications Corp. (TRT), an IRC which is one of the intervenors here.

Following WU's introduction of its new WUITS service several IRCs complained to the FCC that WU was engaging in international telegraph operations in violation of § 222(c)(2) of the Act, was failing in violation of § 222(e)(1) to distribute the overseas traffic among IRCs, was violating § 214 of the Act by not first obtaining FCC authorization for the service, and was violating § 203 by not filing a tariff for the new service.[12] On December 12, 1979, the FCC, after receiving WU's response to the complaint, conducted an investigation, accepted briefs from the parties, and adopted an order from which the IRCs appeal by way of their petition for review. The order, although conceding that WU was "providing a service to overseas points which is clearly foreign communications service within the meaning of § 3(f) of the Act," 47 U.S.C. § 153(f), concluded that WU's role in providing the service consisted only of "domestic telegraph operations" as defined in § 222(a) and (b), since it was merely performing its traditional "landline haul" up to a "point of exit" from the United States and the foreign carriers, CNCP and Telecomex, were performing the overseas or international telegraph operation within the meaning of § 222(a), just as the IRCs had operated from gateway cities in handling overseas business originating or terminating via WU lines or channels within the continental United States. Apparently fearing that this analysis might be upset the Commission sought to resurrect its position that WU was not barred by § 222(c)(2) from "engaging in international telegraph operations" *in futuro* provided authority were granted by the FCC, a position which we had firmly rejected in *Mailgram, supra.*

11. For instance, the interconnection agreement between WU and Telecomex recognizes that the WUITS service is one provided by WU to its subscribers, stating:
"The parties will permit the use of their respective facilities for the interchange of teletypewriter exchanges between Western Union subscribers, on the one hand, and overseas subscribers via facilities of Telecomex, on the other hand. . . ."

12. On October 25, 1979, ITT instituted an action against WU in the District Court for the Southern District of New York (*ITT World*

*Communications Inc. v. Western Union Telegraph Co.*, 621 F.2d 1201) seeking to enjoin WU from continuing to offer the WUITS service until the Commission had ruled on its legality. After WU agreed not to engage in further advertising or solicitation to the general public and the FCC on December 7, 1979, advised that it intended to act on the issue of legality on December 12, 1979, the district court, following the FCC's adoption of the order here under review *sua sponte* dismissed the action pending before it.

The FCC further found that WU was not required to obtain further certification from it under § 214 because it was not proposing to construct, acquire or operate a "new line" within the meaning of that section but was using existing facilities that had already been certified in conjunction with foreign carrier facilities that did not require certification. No restriction had been placed upon the use of these facilities for a WUITS–type of service. WU was ordered, however, to file a tariff pursuant to § 203, the FCC holding that the requirement was not excused by the fact that the service was being rendered in part by foreign carriers not subject to FCC jurisdiction.[13] Pending review of the tariff WU was permitted to continue providing the new service. The IRCs promptly sought review by this Court of the FCC's order.

## DISCUSSION

We start with the rule, firmly settled by our decision in *Western Union International, Inc. v. FCC*, 544 F.2d 87 (2d Cir. 1976), *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977) (*Mailgram*), that WU is prohibited by § 222(c)(2) of the Act from engaging at any time in "international telegraph operations" as defined in the Act and must confine itself to "domestic telegraph operations." The principal question to be decided, therefore, is whether WU's transmittal of messages overseas via CNCP and Telecomex may, notwithstanding the international character of the communications, nevertheless be classified as "domestic telegraph operations," as held by the FCC. The Commission concluded that WU may continue its WUITS service on the theory that it is merely handling the landline haul or domestic segment of such communications up to or from points of exit from or

entrance into the continental United States, and that the international portion of the traffic is handled by the two foreign carriers which, not being subject to FCC jurisdiction, are not prohibited by the Act from engaging in such operations. According to the Commission, WU, in offering overseas WUITS service, merely performs the same domestic service with foreign carriers that it has rendered in the past in conjunction with the IRCs as recipients of overseas traffic. We are satisfied for several reasons that this theory cannot be accepted and that the WUITS service violates § 222 of the Act.

The legislative history of § 222 as outlined above and in our *Mailgram* decision and the consistent practice of the parties under the Act since that statute was enacted in 1943 make it clear that with respect to overseas messages Congress intended to prevent WU from abusing its control of domestic facilities to the injury of the IRCs by limiting WU to service within the continental United States to and from points of exit or gateways within the country, from which the IRCs would handle the overseas segment of any overseas traffic. Moreover, § 222(e) mandates WU, again for the protection of the IRCs, to distribute such overseas traffic fairly according to an FCC–approved formula "among the international telegraph carriers" as defined in § 222(a)(3) and (6), which does not include foreign telegraph carriers such as CNCP or Telecomex. Congress' reference elsewhere in the Act to "foreign telegraph carriers" (e. g., in § 222(e)(2)), shows that it did not intend to permit WU to interchange overseas traffic with such carriers, as distinguished from IRCs, except for limited service to a "contiguous foreign country," i. e., Canada, Mexico, and Newfoundland.[14]

---

13. On January 10, 1980, WU filed with the FCC a tariff for its new WUITS service.

14. Section 222(e)(2) of the Act provides:

"(2) In the case of any consolidation or merger pursuant to this section of telegraph carriers which, immediately prior to such consolidation or merger, interchanged traffic with telegraph carriers in a contiguous foreign country, the consolidated or merged car-

rier shall distribute among such foreign telegraph carriers, telegraph traffic by wire or radio destined to points in such contiguous foreign country and shall divide the charges therefore, in accordance with such just, reasonable, and equitable formula in the public interest as the interested carriers shall agree upon and the Commission shall approve: *Provided, however,* That in case the interested carriers shall fail to agree upon a formula

Under WUITS an overseas WU signal, or electromagnetic expression of traffic, is not transmitted to some point within the continental United States where it is then interfaced with or picked up by the facilities of an interconnecting foreign carrier for transmission overseas, as traffic by IRCs is handled. It is transmitted across the border of the continental United States to microwave towers or other facilities controlled by CNCP or Telecomex. WU's pervasive influence and complete control over its WUITS overseas service sharply distinguishes it from the limited domestic service WU renders to the IRCs. If WU could lawfully send overseas signals as "domestic telegraph operations" to or via a foreign carrier located in Canada or Mexico, nothing would prevent it from sending such signals overseas to or via foreign carriers in other continents, using a satellite, submarine cable or similar new technological advance in electronics. No longer would WU be complying with § 222(e)(1), which provides that it *"shall ... distribute among the international telegraph carriers, telegraph traffic by wire or radio destined to points without the continental United States"* (emphasis supplied). Under the theory advanced by WU and accepted by the FCC, WU could defeat Congress' purpose, which was to protect the IRCs from abuse by WU of its domestic monopoly power (described by the FCC as approaching 100%, see F.C.C. Notice of Inquiry and Proposed Rulemaking, Docket No. CC -79 · 252, 44 Fed.Reg. 67445, 67464 (11/26/79)), simply by teaming up with one or more foreign carriers favored by it and by· passing the IRCs entirely. Moreover, such operations would circumvent and depart from the entire legislative scheme of § 222, which was to restrict WU to the domestic segment

of overseas traffic and require that the international segment be handled by IRCs from points *inside* the continental United States. Although WU was permitted after the enactment of § 222 in 1943 to continue service between the continental United States and both Canada and Mexico, it was obligated to divest itself of operations under which, prior to 1943, it had handled traffic from the continental United States to overseas points via Canada. See *Western Union Tel. Co. v. United States*, 267 F.2d 715, 718 (2d Cir. 1959); *RCA Communications, Inc.*, 29 F.C.C. 485, 492 (1960).

The term "point of exit," to and from which WU can domestically carry overseas traffic, refers to the last terminal point *within* the continental United States at which the communications are transmitted or received by an IRC. This construction is consistent with § 222(e)(2), which directs with respect to interchanged traffic with "foreign telegraph carriers" in *contiguous* foreign countries (Canada, Mexico and Newfoundland) that WU shall distribute such traffic among these carriers and divide charges therefor according to a formula approved by· the FCC.[15] It is also consistent with Congress' failure to make any provision in the international formula required by § 222(e)(1) for distribution of overseas traffic to "foreign carriers" rather than to IRCs. To adopt WU's theory would be to make a mockery of the Act's carefully devised differentiation between domestic and international telegraph operations. If WU were able to transmit messages overseas by any foreign carrier, there would be no point served in distinguishing between domestic and international carriers and telegraph operations, § 222(a)(2), (3), (5), (6).

which the Commission approves as above provided, the Commission, after due notice and hearing, shall prescribe in its order approving and authorizing the proposed consolidation or merger a formula which it finds will be just, reasonable, equitable, and in the public interest, will be, so far as is consistent with the public interest, in accordance with the existing contractual rights of the carriers, and will effectuate the purposes of this sub-

section. As used in this paragraph, the term 'contiguous foreign country' means Canada, Mexico, or Newfoundland."

**15.** Under § 222(a)(5) WU may, as a "domestic telegraph carrier," regardless of "points of exit" transmit to Canadian or Mexican carriers messages which *terminate* in those countries. It is not authorized, however, to use their facilities for the transmission of messages overseas.

Neither CNCP nor Telecomex qualify for sharing in revenues from overseas traffic under § 222(e)(1) since they are not "international record carriers" as defined in § 222(a)(3) of the Act. There is no suggestion that a majority, much less any, of their revenues are derived from "international telegraph operations," as defined in § 222(a)(6), i. e., from overseas messages which originate or terminate at points outside the continental United States, Canada, or Mexico. Moreover, although the Act is not explicit on the subject of whether the term "international telegraph carrier" refers to the IRCs, which are all American companies, the legislative history indicates that this was generally assumed by Congress or that at least an IRC would be an FCC-regulated concern as distinguished from a "foreign telegraph carrier." See *Hearings pursuant to S.2598 before a Subcommittee of the House Committee on Interstate and Foreign Commerce*, 77th Cong., 2d Sess. 25 -27, 178 (1942); S.Rep.No. 769, 77th Cong., 1st Sess. 22 (1942).

Faced with this obstacle the FCC here argues that the § 222(e)(1) formula provision applied only to *unrouted* traffic and not to traffic *routed* by a WU customer.[16] WUITS messages are characterized as traffic routed by WU customers via the foreign carriers CNCP and Telecomex. Putting aside the Commission's own finding that WU chooses the transmitting points through Canada or Mexico and the IRCs' contention that it is WU, not its customers, which chooses the foreign carrier to use for WUITS business, nothing in the Act exempts routed traffic from the requirements of § 222(e)(1). To the contrary, § 222(e)(1) "contemplates that *all* international telegraphic communication traffic destined for points outside the United States be distributed among the various international carriers according to the terms of a formula approved by the Commission, and the Inter-

national Formula adopted is intended to cover *all* such traffic," *Commercial Pacific Cable Co.*, 43 F.C.C. 2304, 2317, affd. sub nom. *Western Union Tel. Co. v. United States*, 217 F.2d 579 (2d Cir. 1954) (emphasis in original). Although " 'Routing' may properly be taken into account in shaping a formula," *id.*, and the FCC has treated routed and unrouted traffic via the IRCs differently, see *Separate Report on Formulas*, 10 F.C.C. 184 (1943); *International Record Carriers' Scope of Operations*, 57 F.C.C.2d 190 (1976), all overseas outbound traffic, including WUITS, is subject to the mandatory requirements of § 222(e)(1). This includes Telex communications, see *Western Union Divestment*, 30 F.C.C. 323, 387 (1961), to which the formula is applied in interconnections between WU and the IRCs. The section, read with other provisions of the Act, makes it clear that Congress intended that WU would send all overseas messages via IRCs and that "foreign telegraph carriers" such as CNCP and Telecomex might be used for interchanged traffic in a *contiguous* foreign country, i. e., Canada or Mexico, § 222(e)(2). As the Commission stated in *Commercial Pacific Cable Co.*, 43 F.C.C. 2304, 2316 (1953), affd. sub nom. *Western Union Telegraph Company v. United States*, 217 F.2d 579 (2d Cir. 1954):

"[D]ivestment of Western Union Cables would not prove to be the ultimate solution to the problem of distribution of international messages picked up by Western Union since unsupervised bargaining by Western Union Telegraph Company could result in building up one or more companies at the expense of or even ultimate destruction of other companies. To cope with this situation Section 222(e) was included in the legislation."

The FCC's later decision in *Comsat General Corporation*, 63 F.C.C.2d 192 (1976), does not point in the opposite direction. Comsat General Corp. is a wholly owned Delaware

---

16. The Commission's Memorandum Opinion and Order in this case fails to discuss § 222(e), much less to evaluate its bearing on the problem of statutory construction faced in determining whether WU's new WUITS service could be treated as a "domestic telegraph operation." In view of the obvious relevance of § 222(e) to this issue and to the question of whether WU, notwithstanding our *Mailgram* decision, might re enter international telegraph operations, we can only infer that it was deliberately ignored.

subsidiary of Communications Satellite Corporation, a District of Columbia company authorized by the Communications Satellite Act of 1962, 47 U.S.C. §§ 701--44, to participate in an international consortium engaged in operation of a satellite system used for international communications. Thus it is a specially authorized American corporation, subject to FCC jurisdiction, and not a foreign telegraph carrier. Moreover, it derives the major portion of its revenues from satellite systems serving the continental United States and equipped ships at sea.

The FCC's position that WU may engage in overseas service via WUITS is not only inconsistent with the language of the Act as it has been construed by us in *Mailgram* but is inconsistent with the view repeatedly expressed by the FCC itself in cases arising prior to *Mailgram*, see, e. g., *Western Union Tel. Co.*, 25 F.C.C. 35, 43--44 (1958); *Commercial Pacific Cable Co.*, 43 F.C.C. 2304, 2315 (1953); *affd. sub nom. Western Union Tel. Co. v. United States*, 217 F.2d 579 (2d Cir. 1954); *Telegraph Service with Hawaii*, 28 F.C.C. 599, 605, *affd. on reconsideration*, 29 F.C.C. 714 (1960), and by us earlier in *Western Union Telegraph Co. v. United States*, 267 F.2d 715 (2d Cir. 1959). For instance, in *Western Union Divestment*, 30 F.C.C. 951, 952–53 (1961), the FCC said:

> "As we read section 222, its rationale lies in a contrary premise by the Congress that the close relationship, financial and otherwise, between Western Union and its cable system was not in the public interest because of the inherent difficulty in policing it so as to insure that Western Union, after its merger with Postal Telegraph Co., did not favor its cable system over other international telegraph carriers. It was this difficulty that prompted the divestment requirements; otherwise, Congress could have merely prohibited favoritism and not required divestment."

Recognizing that its present decision not only defies our ruling in *Mailgram* but purports to overrule a long line of its own prior decisions, the Commission now describes its earlier rulings as error and, emboldened by the dissent in *Mailgram*, which took the view that § 222(c)(2) of the Act did not preclude it from authorizing re--entry into international telegraph operations to the extent found in the public interest, implies that in our recent decision in *ITT World Communications Inc. v. FCC*, 595 F.2d 897 (2d Cir. 1979), we invited it "to reassess the divestiture matter along the lines" developed in the *Mailgram* dissent. Nothing could be further from the fact. However, appealing the reasoning of the *Mailgram* dissent might now be to the Commission, it does not represent the law of this Circuit and the FCC has no right to treat it as such, particularly in light of our denial of *en banc* review on April 22, 1977, and the Supreme Court's denial of review, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977). The majority opinion firmly establishes the law of the Circuit. See *Kremer v. Chemical Construction Corporation*, 623 F.2d 786, 787 (2d Cir. 1980); *United States v. Cirami*, 563 F.2d 26 (2d Cir. 1977); *Rodman v. C.I.R.*, 548 F.2d 1109, 1111 (2d Cir. 1977), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977). "[T]he Board is not a court nor is it equal to this court in matters of statutory interpretation." *Allegheny General Hospital v. NLRB*, 608 F.2d 965, 970 (3d Cir. 1979).

Nor is the Commission's defiance of *Mailgram* in any way supported by our later decision in *ITT World Communications* which dealt with the entirely different question of whether the "gateway" proviso of § 222(a)(5) imposes a statutory limitation upon entry of other *unmerged* domestic telegraph carriers into international telegraph operations. On the contrary, we there reaffirmed *Mailgram* as the premise of our analysis stating:

> "Congress feared that WU, which also had extensive international operations, would be able, unless legislatively prevented, to divert unrouted international messages to its own service, thereby seriously damaging other international record carriers." 595 F.2d at 905--06.

The Commission is obligated to enforce its statutory duties as thus construed, not as it would like to have them enlarged. *Ameri-*

can Tel. & Tel. Co. v. FCC, 572 F.2d 17, 25–26 (2d Cir.), cert. denied, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978).

Another argument advanced by WU and accepted by the Commission as support for legalizing its WUITS service as a domestic telegraph operation is that after 1943 WU transmitted telegraph traffic via Canadian carriers to Australia, which had the only trans–Pacific cable link from North America to that country. *Separate Report on Formulas*, 10 F.C.C. 184, 192 (1943). This service, however, represented a minor deviation from the plain limitations of § 222, prompted by pre--existing contractual relations which the Canadian carriers had with WU and Postal Telegraph before § 222 was enacted and by the wartime emergency existing at the time of their merger. See *id.*, 10 F.C.C. at 192 ·94. This *de minimis* historical anomaly was later explained by the Commission:

> "The original justification for the provision was that the only direct cables serving the affected points landed in Canada. Accordingly, we acquiesced [in 1943] to the arrangement to respect a customer's choice to route his message via cable; even though that required intermediate relays and created a greater potential for delay, which could have been avoided by use of then ·available direct radio circuits. The fact that we were then engaged in World War II was an important consideration in our approval of this arrangement. The availability of alternate routing through Canada for messages to Aus-

tralia was considered important to the war effort. See 10 FCC at 193." *International Record Carriers' Scope of Operations*, 57 F.C.C.2d 190, 205 (1976).

In view of the uniqueness of the circumstances and the non ·existence of any court adjudication of the arrangement, it does not provide any legal support for the operations challenged here.

In support of the Commission's order its counsel urges that recent decisions by it, revisions in the structure of domestic and international communication, and technological changes in the communications business have faced WU with more competition, justifying WU's re entry into international telegraph operations. WU has undoubtedly been exposed to more competition (1) by permission having been granted to other domestic carriers to operate as specialized microwave radio carriers,[17] (2) by the entry of other companies into the domestic market,[18] (3) by the recent authorization to the IRCs to expand their international operations to some 21 "gateway" cities in lieu of the 5 to which they were formerly limited,[19] (4) by authorization of the IRCs to offer an optional rate to customers that does not include a traditional "landline haul," making it more economical for some international customers to bypass WU,[20] (5) by the entry of "value added" carriers which as brokers or entrepreneurs purchase basic transmission service in bulk from carriers and resell the service at retail to the public,[21] and (6) by new technological develop-

---

17. *Specialized Communications Common Carrier Services*, 29 F.C.C.2d 870, *on petitions for reconsideration*, 31 F.C.C.2d 1106 (1971), *affd. sub nom. Washington Util. & Transp. Commn. v. FCC*, 513 F.2d 1142 (9th Cir.), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

18. *Domestic Public Message Services*, 71 F.C.C.2d 471, *on reconsideration*, 73 F.C.C.2d 151 (1979), *reviewing pending sub nom. Western Union Telegraph Co. v. FCC*, D.C. Circuit No. 79–1352 (filed April 2, 1979); *ITT World Communications, Inc.*, 73 F.C.C.2d 709 (1979).

19. See FCC decision and order in *Matter of International Record Carriers' Scope of Operations in the Continental United States*, Dkt. No.

19660, RM–690, adopted Dec. 12, 1978, and released Feb. 27, 1980.

20. *RCA Global Systems, Inc.*, 67 F.C.C.2d 1328 · (1978); *ITT Domestic Transmission Systems, Inc.*, 62 F.C.C.2d 236 (1976).

21. See *Packet Communications, Inc.*, 43 F.C.C.2d 922 (1973); *Graphnet Systems, Inc.*, 44 F.C.C.2d 800 (1974); *Telenet Communications Corp.*, 46 F.C.C.2d 680 (1974); *Resale and Shared Use of Common Carrier Services*, 60 F.C.C.2d 261 (1976), *on petitions for reconsideration*, 62 F.C.C.2d 588 (1977), *affd. sub nom. American Tel. & Tel. Co. v. FCC*, 572 F.2d 17 (2d Cir.), *cert. denied*, 439 U.S. 875, 99 S.Ct.

ments, including use of satellites[22] and computer–based switching and message processing techniques.

It may be that these factors warrant a revision of § 222 to suit the changes in the market, most of which were approved by the Commission itself. But the plain language of § 222, its history, and the interpretations of it by the court and the Commission, make it clear that in order to protect the IRCs against abuse by WU of its dominance of the domestic market (which dominance still exists) it is not entitled to engage in international telegraph operations. As we and the Commission have previously recognized, these arguments of the Commission's counsel should therefore be addressed to Congress, not to us. See *Mailgram, supra,* 544 F.2d at 93 ("Because it was Congress that enacted the statute and imposed this ban on WU, it is only Congress that . . . can change it."); *Telegraph Service with Hawaii,* 28 F.C.C. 599, 605, *affd. on reconsideration,* 29 F.C.C. 14 (1960) ("[T]he remedy is to ask Congress to amend section 222, not for us to misinterpret it"). The Commission's repeated efforts to induce Congress to modify § 222 demonstrate that it is well aware of the proper route.

Since WU's conduct of international telegraph operations via CNCP and Telecomex clearly violates § 222 of the Act and cannot lawfully be authorized by the FCC it becomes unnecessary to decide whether the Commission also failed to satisfy the requirements of §§ 203 and 214 of the Act.

The Commission's order is vacated. The case is remanded with directions that WU be ordered immediately to cease providing its overseas service via CNCP, Telecomex or any carriers other than IRCs and to cease conduct of any international telegraphic operations.

---

213, 58 L.Ed.2d 190 (1978); *Graphnet Systems, Inc.,* 63 F.C.C.2d 402 (1977), *on petition for reconsideration,* 67 F.C.C.2d 1020 (1978), *affd. in part and remanded sub nom. ITT World Communications, Inc. v. FCC, supra,* 595 F.2d 897.

22. See, e. g., *Domestic Communications–Satellite Facilities,* 35 F.C.C.2d 844, *on petitions for reconsideration,* 38 F.C.C.2d 655 (1972).